UNITED STATES of America, Plaintiff,

v.

FULLPAIL CATTLE SALES, INC.,
Commercial State Bank,
Defendants.

No. 85–C–288.

United States District Court,
E.D. Wisconsin.

July 25, 1986.

See also 617 F.Supp. 73.

Joseph Stadtmueller, U.S. Atty. by Stephen Liccione, Asst. U.S. Atty., Milwaukee, Wis., for plaintiff.

James S. Grodin, Milwaukee, Wis., for Commercial State Bank.

Angela E. Canellos, Hickman Law Office, Wauwatosa, Wis., for Fullpail Cattle Sales, Inc.

## DECISION and ORDER

MYRON L. GORDON, Senior District Judge.

The United States filed this action pursuant to 28 U.S.C. § 1345 to recover damages for the alleged conversion of approximately 40 head of dairy cattle. The plaintiff, acting through the Farmers Home Administration (FmHA), claims a senior security interest in these cattle. The subject cattle were seized by employees of one of the defendants in this case, Fullpail Cattle Sales, Inc. (Fullpail), on November 15, 1982. A trial to the court was held on June 9–10, 1986.

There are three issues to be resolved in this case. First, in order to determine if Fullpail's conduct constituted a conversion, I must determine whether the plaintiff was entitled to immediate possession of the cattle at the time they were seized by Fullpail. The plaintiff's entitlement depends on the relative superiority of their security interest in such cattle. Secondly, if, indeed, an unlawful conversion occurred, I must determine the extent of the resulting damages. Finally, I must determine exactly who is liable for any damages found to arise from the conversion.

Based on the record and all testimony elicited at trial, I find that defendants Fullpail Cattle Sales and Commercial State Bank are jointly and severally liable for damages arising from Fullpail's wrongful conversion of cattle in violation of the plaintiff's valid and superior security interest. I adjudge the amount of damages to be $28,314.

## FINDINGS OF FACT

John and JoAnn Reysen, who are not parties to this action, acquired a dairy farm in Belgium, Wisconsin, in 1981. The Reysens obtained loans totalling $100,000 from the FmHA which enabled them to purchase their farmland and dairy herd. Thus, on July 18, 1981, the Reysens and the FmHA executed a financing statement that covered the Reysens' farm real estate and "certain types of collateral, including proceeds and products thereof [namely] [c]rops, livestock, other farm products, farm and other equipment, supplies and inventory." This financing statement was properly filed and recorded with the Ozaukee County register of deeds on July 18, 1981.

Six days later, on July 24, 1981, the Reysens executed and delivered to the plaintiff a promissory note and security agreement evidencing a loan of $90,000 from the FmHA. The security agreement memorialized the United States' interest in, among other things, "[a]ll livestock, ... now owned or hereafter acquired by Debtor, together with all increases, replacements, substitutions and additions thereto...." The security agreement also generally described the Reysens' dairy herd in terms of quantity, kind, breed, color and average weight.

Most of the cows described in the July 24, 1981, security agreement were purchased from Fullpail and delivered by Fullpail to the Reysens in early July, 1981. Fullpail was operated by members of the Kueffner family, namely Ernest Kueffner, Sr., Ernest Kueffner, Jr., and Vincent Kueffner. According to the testimony of Ernest Jr., financing was arranged for many Fullpail customers with a few area banks but most frequently with Commercial State Bank, co-defendant in this case. Such financing was arranged for the benefit of the Reysens in the following manner: John Reysen signed a note and security agreement as debtor to Fullpail and the purchased cattle served as security on the note. Fullpail, in turn, assigned the note to Commercial State Bank, but retained an interest in the note as a guarantor.

With respect to the instant case, on July 8, 1981, Fullpail and the Reysens executed a security agreement which listed thirty cows by ear tag number as collateral. This document designated John Reysen as debtor, Fullpail Realty, Inc. (a branch of Fullpail Cattle Sales) as the secured party, and

co-defendant Commercial State Bank as the secured party's assignee. On September 8, 1981, this security agreement, which included within it a financing statement, was filed with the Ozaukee County register of deeds.

In addition to financing obtained through the FmHA and Commercial State Bank, the Reysens borrowed funds from Valley State Bank of Kewaskum. To secure these funds, Valley State Bank held a lien on certain of the Reysens' dairy cows. In fact, the FmHA's security interest in these Reysen cows was expressly subordinated to the Valley State Bank lien. However, in a letter dated November 23, 1981, Valley State Bank relinquished its senior lien position on seventy-one cows, specifically listed by ear tag number, in favor of the FmHA.

Several months later, on March 26, 1982, the Reysens obtained another FmHA loan for $10,000. They executed and delivered to the FmHA a second promissory note and concomitant security agreement. Like the FmHA/Reysen security agreement of July 24, 1981, this second security agreement memorialized the United States' interest in, among other things, "all livestock ... now owned or hereafter acquired by Debtor, together with all increases, replacements, substitutions, and additions thereto...." Ninety-eight dairy cows, heifers and calves were listed specifically by ear tag numbers in the description portion of this security agreement.

As well as borrowing an additional $10,-000 from the FmHA, the Reysens purchased additional cows from Fullpail. To make this purchase, the Reysens signed another security agreement with Fullpail which described seven "holstein animals" by ear tag number as the securing collateral on March 4, 1982. This transaction is evidenced by another financing statement (and security agreement) memorializing an interest in seven holstein cows filed in Ozaukee County on June 25, 1982. Similar to the first Fullpail filing, this document lists John Reysen as the debtor, defendant Fullpail as the secured party, and co-defendant Commercial State Bank as its assignee.

Despite their purchases, it soon became apparent that the Reysens were encountering farming troubles. By spring of 1982, a number of the Reysen cows had died. The rest of the herd was not producing milk at optimal levels. This resulted in low milk revenues and a serious cash flow problem for the Reysens; the Reysens were unable to meet their ongoing business obligations.

Unfortunately for the Reysens, the infusion of new cattle from Fullpail and working capital from the FmHA failed to remedy the serious difficulties they were facing on the farm. Milk production and revenues continued to be low, and the Reysens continued to fall behind on all of their bills. Among their delinquencies were the payments due on the two notes assigned by Fullpail to the Commercial State Bank.

The bank ordinarily contacted the Kueffners when notes assigned to it by Fullpail became delinquent. The Kueffners, in turn, would contact the borrower about the delinquency. Indeed, Ernest Kueffner, Jr. testified that he considered himself an "agent" of the bank. Operating in accordance with this practice, in November 1982, when the Reysens' financial problems had not subsided, the Kueffners met with the Reysens. A first meeting took place on November 7, 1982, at the Reysen farm to discuss possible solutions to the Reysen delinquencies. It was determined that additional loans were necessary to save the farm. Thus, the Reysens contacted the FmHA, and Fullpail contacted Commercial State Bank for the Reysens, but neither institution would provide further financing to the Reysens.

To discuss what to do without further financing, the Kueffners met with John Reysen again on November 9. They told him that the bank had raised the possibility that the cattle would have to be repossessed and suggested that the Reysens consider getting out of farming altogether. Then, on November 10, 1982, just five days before repossession was carried out, an unsigned security agreement/financing

statement was filed with the Ozaukee County register of deeds. Identified as the debtor and secured party, respectively, were John Reysen and Fullpail Cattle Sales. The secured collateral was described as thirty-five holstein cows listed by ear tag numbers.

Finally, on November 15, 1982, the Kueffners arrived at the Reysen farm to repossess that portion of the herd in which they claimed a security interest; thirty milk cows and ten heifers were taken. Also, John Reysen sold additional cattle to Fullpail. Although the precise number of cows sold is not established in the record, it is clear that the Kueffners paid John Reysen $2800 for these cows. Ultimately, this $2800 was paid over to Valley State Bank of Kewaskum to satisfy the Reysens' indebtedness to that bank.

When the Kueffners arrived on the farm that November 15th afternoon, they brought with them two forms titled "Acknowledgment of Voluntary Surrender." The Kueffners obtained these forms from William Rayome, vice-president of Commercial State Bank. The forms were presented to John Reysen on the afternoon of repossession, and John Reysen signed them. However, later the following week John Reysen received two more forms from Commercial State Bank titled "Notice of Surrender of Collateral." John Reysen refused to sign these.

When the FmHA learned of the Kueffners' repossession, it made several requests by letter for restitution or return of the cows pursuant to its claimed superior security interest. The Kueffners failed to respond to any of these letters. Ultimately, the FmHA turned to this court for relief.

## CONCLUSIONS OF LAW

### Recovery for Conversion

 The plaintiff is entitled to relief in this case if it has adequately established the necessary elements of conversion. I believe that it has. Conversion actions can be used to enforce the rights of secured parties against transferees. *Production Credit Ass'n of Madison v. Nowatzski*, 90 Wis.2d 344, 353, 280 N.W.2d 118 (1979). In order to recover in a conversion action, the plaintiff must prove that it had possession, or the right to immediate possession, of the property at issue at the time of the alleged conversion. *Production Credit Ass'n of Chippewa Falls v. Equity Coop Livestock Sales Ass'n*, 82 Wis.2d 5, 19, 261 N.W.2d 127 (1978); Prosser & Keeton, Law of Torts § 15, at 102 (5th ed. 1984).

The Reysens, rather than the plaintiff, had actual, physical possession of the cattle at the time of the alleged conversion. Therefore, the viability of the plaintiff's conversion claim depends on its right to immediate possession of the cattle by virtue of its security interest therein. The FmHA security interest entitled the plaintiff to immediate possession of the cattle if two conditions existed at the time of the Fullpail cattle seizure: 1) the plaintiff's security interest in the cattle seized was superior to Fullpail's, and 2) the Reysens, as debtors of the plaintiff, were in default as to the plaintiff at the time of the conversion. An examination of the record persuades me that both of these conditions were met.

### Superior Security Interest

Security interests are created, or attached, when the formal requisites of Wis. Stat. § 409.203 are satisfied. The statutory requisites are: "(a) ... the debtor has signed a security agreement which contains a description of the collateral ...; (b) value has been given; and (c) the debtor has rights in the collateral." Wis.Stat. § 409.-203(1).

 In the instant case, several different security interests are alleged to have attached to various portions of the Reysens' dairy herd. I will examine each one separately to determine whether valid security interests have been created. As to the plaintiff's claimed security interest, two agreements were executed on July 24, 1981, and March 26, 1982, respectively. Both security agreements were signed by the Reysens as debtors. Value was given

in the form of a $90,000 loan. Moreover, the Reysens had possession of the secured collateral; indeed they were the owners of the cattle and, therefore, had "rights in the collateral." *See In re Ten Brock,* 4 U.C.C. Rep. Serv., 712 (W.D.Mich.1966). *See also* Anzivino, When Does a Debtor Have Rights in the Collateral Under Article 9 of the Uniform Commercial Code?, 61 Marg.L. Rev. 23, 28–29 (1977).

Finally, both of the plaintiff's security agreements contain adequate descriptions of the collateral. The general prescription of the Uniform Commercial Code is that "any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described." U.C.C. § 9–110 (codified in Wisconsin at Wis.Stat. § 409.110). Cattle described by erroneous ear tag number have been held to be "reasonably identified" in a security agreement description. *In re Reiser,* 20 U.C.C.Rep.Serv. 529, 530–31 (W.D.Wis.1976). Indeed, it is not necessary that a security agreement description list collateral by name, model number or other specific designation in order to meet the "reasonably identified" standard. *National Acceptance Co. v. Doede,* 78 F.R.D. 333 (W.D.Wis.1978).

■ I find that the plaintiff's July 24, 1981, security agreement meets this liberal standard. That agreement describes the Reysen herd in terms of quantity, kind, breed, color and average weight. The March 26, 1982, agreement is even more specific. It includes both a general description as well as a list of dairy cows covered identified by accurate ear tag number. Therefore, I conclude that these descriptions reasonably identify the Reysen herd and are sufficient to satisfy the description element of Wis.Stat. § 409.203.

■ In addition to the existing collateral described in the plaintiff's security agreements, both agreements included a clause describing cows "hereafter acquired by Debtor, together with all increases, replacements, substitutions, and additions thereto. . . ." After-acquired property clauses, such as those incorporated into the plain-

tiff's security agreements, are specifically recognized by the Uniform Commercial Code and Wis.Stat. § 409.204. Moreover, they have been expressly approved by the courts. *See, e.g., Barth Brothers v. Billings,* 68 Wis.2d 80, 227 N.W.2d 673 (1975); *Burlington National Bank v. Strauss,* 50 Wis.2d 270, 184 N.W.2d 122 (1971). The use of after-acquired property clauses for livestock collateral is quite logical. "By the use of an after-acquired clause, the entire herd can be covered without specific identification of each animal. As the farmer acquires new cattle by birth or purchase the security agreement can embrace these additions." 1C Coogan, Hogan & Vagts, Secured Transactions under the Uniform Commercial Code, § 2703 (1986).

Thus, I am satisfied that plaintiff's documents contained adequate descriptions of existing and after-acquired collateral and that the plaintiff had effectively created a security interest in the entire Reysen herd. I am also satisfied that when this security interest attached, it became a perfected security interest.

■ A security interest in dairy cattle is perfected when two conditions are met: the security interest is attached and a financing statement is filed. Wis.Stats. §§ 409.-302, 409.303. The plaintiff in this case filed its financing statement before either of its security agreements with the Reysens were executed. However, by statute, perfection can be accomplished even if a "financing statement [is] filed before a security agreement is made or a security interest otherwise attaches." Wis.Stat. § 409.303(1). Moreover, a properly filed financing statement will serve to perfect a second security interest created by a later agreement between the same creditor and debtor covering the same collateral. *See In re Kendrick & King Lumber, Inc.,* 32 U.C.C. Rep.Serv. 575, 579–80 (W.D.Okla. 1981); *In re Gilchrest Company,* 16 U.C.C.Rep.Serv.Bankr. 1384, 1387–89 (E.D.Pa. 1975).

In the instant case, the plaintiff's first security interest was perfected on July 24,

1981, the date on which the plaintiff's blanket financing statement was filed and six days after the plaintiff's first security interest attached. The plaintiff's second security interest was perfected on March 26, 1982, the date the second FmHA security agreement was executed.

■ Even if the March 26, 1982, security agreement was not perfected by the earlier financing statement filing, I am impressed that the entire Reysen herd was nevertheless subject to a perfected security interest on behalf of the plaintiff. I arrive at this conclusion because I believe that the collateral description in the first security agreement was in fact sufficient to create such an interest even without the subsequent, more specific security agreement dated March 26, 1982. Thus, I am confident that a security interest in the entire Reysen herd, as it existed on November 15, 1982, was attached and perfected as of July 24, 1981.

■ To identify the defendants' security interest, if any, in the Reysen herd, a similar analysis is required. The first agreement between the Reysens and the defendants was signed by John Reysen on July 8, 1981. The collateral was described by ear tag number and was, therefore, reasonably identified. Value was given and the debtors had rights in the collateral. Thus, pursuant to Wis.Stat. § 409.203(1), this agreement created an enforceable security interest in the thirty cows listed. I reach a similar conclusion with respect to the security agreement executed on March 4, 1982. All the formal requisites are satisfied so that a security interest was created with respect to the seven cows listed in the March agreement.

■ However, the alleged security agreement filed by the defendants on November 10, 1982, describing thirty-five holstein dairy cows by ear tag number fails to create an enforceable security interest in those cows because it is not signed by the Reysens. *See* Wis.Stat. § 409.203(1). Accordingly, this interest could not be perfected. Wis.Stat. § 409.303(1).

■ As to the thirty-seven cows in which the defendants can validly claim a security interest, perfection has also been accomplished. The defendants perfected their security interest in the thirty cows described in the security agreement executed on July 8, 1981, by filing a corresponding financial statement on September 8, 1981. With respect to the security interest in the seven cows, a proper filing was made, and consequent perfection accomplished, on June 25, 1982.

■ Having outlined the various interests in the Reysen dairy herd, I now turn to the question of priority between such interests. I can quickly resolve the conflict over the thirty-five holstein cows described in the defendants' unsigned security agreement filed on November 10, 1982. The defendants' interest is unperfected and unsecured; the plaintiff's is perfected and secured. As between secured and unsecured creditors, the secured party prevails. Wis.Stat. § 409.301. Therefore, with respect to the thirty-five holstein cows, the plaintiff's interest is senior.

■ As to the other conflicting interests, the dispositive rule is set forth in Wis.Stat. § 409.312(5)(a) which provides as follows:

> Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.

This "first to file" rule means that when two creditors hold conflicting security interests in the same collateral, the creditor who files its financing statement first has priority, regardless of the time of the execution of the underlying security agreements. *Thorp Commercial Corporation v. Northgate Industries, Inc.,* 654 F.2d 1245, 1247–48 (8th Cir.1981); *In re McBee,* 714 F.2d 1316, 1325 (5th Cir.1983). Pursuant to this general rule, the plaintiff's fi-

nancing statement filed on July 18, 1981, established the United States' prevailing interest in the entire Reysen herd and, necessarily, all of the cattle taken on November 15, 1982.

 The defendants' interests would nevertheless prevail over the plaintiff's if the defendants' security interests constituted perfected purchase money security interests. One of the important exceptions to the "first to file" rule concerns purchase money security agreements. Despite the confused state of the record on this point, it is at least arguable that the defendants had a purchase money interest in the Reysens' cattle. See Wis.Stat. 409.107(2) (defines purchase money security interest as one "taken by a person who ... gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used."). Purchase money security interests have priority over conflicting security interests in the same collateral only "if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within 20 days thereafter."

In the instant case, the debtors, John and JoAnn Reysen, received their cattle on or around July 8, 1981. Although a security agreement was prepared, there was no financial statement filing, or resulting perfection, until September 8, 1981. Thus, the Fullpail security interest was not in any way perfected when the Reysens received their cows, nor did perfection occur within twenty days thereafter. Thus, the defendants' interests are ranked, in terms of priority, under the ordinary first to file rules, not the exception for perfected purchase money interests. See § 409.312(5)(a). Similarly, defendants' possible purchase money interest in the seven cows sold to the Reysens in March 1982 was not perfected until June 1982, also more than twenty days after the Reysens received those cows. It follows that the purchase money exception does not apply to this later transaction either.

In consideration of the coverage of the plaintiff's financing statement, concomitant security agreements, and consequent perfected security interest, I am persuaded that the United States has a security interest in the cows in question superior to that of the defendants.

*Right to Immediate Possession*

 Having established a prevailing security interest in favor of the plaintiff, I now turn to the question of the plaintiff's right to immediate possession of the collateral. The plaintiff's right to immediate possession depends on whether its debtors, the Reysens, were in default at the time of the conversion. Wis.Stat. § 409.503 ("Unless otherwise agreed, a secured party has on default the right to take possession of the collateral."). As I discussed in my order of September 17, 1985, the relevant agreements between the plaintiff and the Reysens expressly prohibited the debtors from disposing of the loan collateral without the FmHA's written consent; dispositions without consent, it was agreed, would constitute defaults. The plaintiff never consented to the cattle's "disposition" of November 15, 1982. Thus, when the defendants seized the cattle, a default simultaneously occurred, and the plaintiff had the right to immediate possession.

At trial, defendants contended that Valley State Bank held a superior security interest in the cattle when they were seized. This argument ignores the fact that Valley State Bank had subordinated its senior lien position on most of the Reysen cows to the plaintiff on November 23, 1981, nearly a year prior to the conversion that is the root of this case. At the time of that conversion, only those cattle sold to the Kueffners for $2800 were still subject to the first lien of Valley State Bank. However, even this fact does not impinge upon the right of the plaintiff to immediate possession. Wis.Stat. § 409.503 applies to "secured parties"; there is no requirement contained within this provision nor within interpretive case law which indicates that only a senior secured party is entitled to possession upon default.

Accordingly, the plaintiff had a superior right to immediate possession of the thirty

milk cows and ten heifers seized by Fullpail as well as to the members of the herd sold by John Reysen to the Kueffners for $2800.

## Damages

■ Having determined that an unlawful conversion took place, I must now address the question of damages resulting from such conversion. Generally in a conversion action, damages are measured by the value of the property at the time of its conversion, plus interest to the date of trial. *Nowatzski, supra,* 90 Wis.2d at 354, 280 N.W.2d 118.

The plaintiff's lowest valuation of the cattle at the time of conversion is as follows:

| | | |
|---|---|---|
| 30 | milk cows @ $500 each | $15,000 |
| 10 | heifers @ $200 each | 2,000 |
| 3 | yearlings + 1 cow | 2,800 |
| | TOTAL | $19,800 |

The defendants' expert on this matter, Ernest Kueffner, Jr., opined that the value of the cattle at the time of the conversion was approximately $15,000. However, at a deposition prior to trial, Ernest Jr. estimated that $20,000 would be the approximate value of the cattle seized. As the FmHA's low estimate is so close to Mr. Kueffner's earlier estimate, I am persuaded that the FmHA's calculation is neither unfair nor unrealistic. Therefore, the court will accept the $19,800 estimate for purposes of establishing the amount of damages involved here.

■ The plaintiff is also entitled to an additional award of interest. The statutory rate is 12% and will be computed from the time of conversion until trial. *See* Wis. Stat. 814.04(4); *Nowatzski, supra,* 90 Wis.2d at 354, 280 N.W.2d 118. Computed accordingly, the plaintiff is entitled to $19,-800 plus three years and seven months interest at 12%, in the amount of $8,514. The total damage award, therefore, totals $28,314.

## Agency Relationship

The final issue I must resolve is *who* is liable for the total damage award as I have it calculated. It is undisputed that Fullpail undertook the actual seizure of the Reysen cattle. Fullpail is, therefore, liable for the conversion. The plaintiff contends that, in addition, Commercial State Bank should be held liable because, in carrying out the seizure, Fullpail was acting as an agent of the bank.

■ The plaintiff has not convinced me that an express agency relationship existed between Fullpail and the bank at the time of the conversion despite substantial evidence indicating an ongoing business relationship between the two co-defendants. Nor am I convinced that the theory of apparent agency applies. Although the Reysens might have so relied, the plaintiff, United States, was not justified in relying on manifestations of apparent agency as between Fullpail and the bank. *See Schaefer v. Dudarenke,* 89 Wis.2d 483, 489–90, 278 N.W.2d 844 (1979); *Larkin v. Johnson,* 67 Wis.2d 451, 457, 227 N.W.2d 90 (1975).

Can it be said that by its action subsequent to the conversion, the bank ratified Fullpail's conversion of the afternoon of November 15, 1982? Ratification is a manifestation of intent to become a party to a transaction allegedly done on the ratifier's account. *Spivey v. Great Atlantic & Pacific Tea Co.,* 79 Wis.2d 58, 255 N.W.2d 469 (1977); *Matter of Alexander's Estate,* 75 Wis.2d 168, 248 N.W.2d 475 (1977). Ratification relates back to the time of the original transaction so that for all practical purposes the act is deemed to have been authorized when it was committed. *Saros v. Carlson,* 244 Wis. 84, 11 N.W.2d 676 (1943).

■ Applying these general principles to the instant case, I find that ratification occurred. Commercial State Bank manifested its intent to become a party to the seizure of the Reysen cattle by mailing the Reysens forms entitled "Notices of Surrender of Collateral" and asking them for their signatures on the forms. Moreover,

Fullpail was allegedly acting on behalf of the bank. It was contacted by the bank when the Reysens defaulted on the notes it had arranged; Fullpail reported back to the bank on its discussions with the Reysens; at trial, Ernest Kueffner, Jr. even testified that he considered himself an agent of the bank.

Therefore, I find that Commercial State Bank ratified Fullpail's transaction and in so doing rendered itself jointly liable for Fullpail's acts. *See* Restatement (Second) of Agency § 343 (1957).

### CONCLUSION

Based on the foregoing findings of fact and conclusions of law, I find that defendant Fullpail Cattle Sales, Inc. unlawfully converted cattle to which the plaintiff had a superior and immediate right of possession. Defendant Commercial State Bank ratified this conversion.

Therefore, IT IS ORDERED that judgment be and hereby is entered in favor of the plaintiff and against the defendants jointly and severally in the amount of $19,800 plus $8,514 interest accrued from the date of conversion until trial, together with costs and disbursements as taxed by the clerk of court.