**In re KERNER PRINTING COMPANY, INC., Debtor.**

**Bankruptcy No. 94 B 43756 (JLG).**

United States Bankruptcy Court, S.D. New York.

Feb. 22, 1995.

Sachs & Kamhi, P.C., Carle Place, NY, for debtor.

Rogers & Wells, New York City, for Nat-West Bank, N.A.

### MEMORANDUM DECISION ON BANK'S CROSS–MOTION FOR RELIEF UNDER 11 U.S.C. § 363

JAMES L. GARRITY, Jr., Bankruptcy Judge.

Kerner Printing Company, Inc. ("Kerner" or "debtor") has moved this Court pursuant to § 363 of the Bankruptcy Code ("Code") for authorization to utilize National Westminster Bank USA's ("NatWest") cash collateral. Although debtor does not dispute that NatWest has perfected security interests in substantially all its assets, it contends that the bank's liens do not attach to certain "Foreclosure Proceeds" on deposit in its operating account. The matter before us is NatWest's cross-motion pursuant to § 363 of the Code and Bankruptcy Rule 4001(b) for a determination that its perfected and otherwise undisputed security interest extends to those funds. For the reasons stated below, NatWest's cross-motion is granted.[1]

*Facts*[2]

On August 8, 1994 (the "Petition Date"), the debtor filed a voluntary petition for relief under chapter 11 of the Code, and is currently operating as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. Stipulation ¶ 1. NatWest is one of debtor's secured creditors. In part, it is owed approximately $1.1 million on account of loans made to debtor in 1986 and 1989. Debtor is in default under those loans. *See* Stipulation ¶¶ 6–9. Pursuant to properly perfected financing statements (collectively, the "Financing Statement"), as security for those loans, Nat-West has valid, enforceable and perfected first and second priority security interests in all of the debtor's existing and after acquired personal property, including, the debtor's equipment, inventory, accounts, chattel paper, contracts and general intangibles. Stipulation ¶¶ 8, 10, 20–22.

On or about July 31, 1992, debtor sold equipment (the "Burmeister Equipment") then subject to NatWest's lien to Burmeister Lithography, Inc. ("Burmeister") for the sum of $835,000. Stipulation ¶ 23. Orix Credit ("Orix") financed the deal for Burmeister. To facilitate the sale, NatWest released its lien on the equipment by executing a Standard Form UCC–3 Statement (the "UCC–3 Statement") which debtor filed with the New York Department of State and New York County on August 7 and 11, 1992, respectively. *Id.;* Ex. A. As consideration for the sale, Burmeister paid $150,000 cash (which was paid by Orix directly to NatWest) and tendered debtor a $685,000 note (the "Burmeister Note") secured by a purchase money security interest (the "Burmeister Lien") in the equipment. Stipulation ¶ 23. The note and lien collectively will be referred to as the "Burmeister Chattel Paper".[3] On or about

---

1. Our subject matter jurisdiction of this contested matter is predicated on 28 U.S.C. §§ 1334(b) and 157(a) and the "Standing Order of Referral of Cases to Bankruptcy Judges of the Southern District of New York" dated July 10, 1984 (Ward, Acting C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K) and (M).

2. The facts are contained in the parties' PreHearing Stipulation of Undisputed Facts ("Stipulation").

3. There is no dispute that the Burmeister Note and Burmeister Lien are "chattel paper". Pursuant to N.Y.U.C.C. § 9–105(1)(b), that term means "a writing or writings which evidence both a monetary obligation and a security interest in ... specific goods ..."

July 31, 1992, debtor assigned NatWest a security interest in that chattel paper (the "Assignment") as additional security for the payment of its obligations to NatWest. Stipulation ¶ 25, Ex. B.

Burmeister defaulted under the Burmeister Note and thereafter filed a voluntary chapter 11 petition. By order dated June 24, 1994, debtor was granted relief from the automatic stay in Burmeister's case to exercise its rights under its security agreement and obtain peaceful possession of the equipment. Stipulation ¶ 26. In July 1994, after repossessing the Burmeister Equipment, debtor notified NatWest that it intended to sell it free and clear of liens to Press–Tech, Inc. ("Press–Tech") for $535,000 in a private, non-judicial foreclosure sale conducted pursuant to the debtor's security agreement. Stipulation ¶ 27. Pursuant to a certain bill of sale dated as of July 20, 1994 (the "Bill of Sale"), the terms of the sale provided for an initial cash payment of $275,000 (the "Initial Certified Check") with final payment due by October 25, 1994 in the amount of $245,000 (the "Final Certified Check"). The only written evidence of Press–Tech's obligation to make the Final Payment (the "Press–Tech Account") was contained in the Bill of Sale and a certain escrow agreement between Press–Tech and Sachs & Kamhi, P.C., debtor's counsel, as escrow agent. Id.

The sale of the Burmeister Equipment to Press–Tech took place on or about July 20, 1994. Stipulation ¶ 28. On or about August 1, 1994, Press–Tech delivered the Initial Certified Check in the amount of $275,000 made payable to the order of Sachs & Kamhi, P.C., as escrow agent pursuant to the written escrow agreement as the initial payment. Id. NatWest sent a letter to the debtor dated August 3, 1994, asserting its security interest in the sale proceeds and demanding that they be paid to NatWest. Stipulation ¶ 28. By letter dated August 5, 1994, Sachs & Kamhi

responded that Orix held a first lien on the sale proceeds and that NatWest had consented to that lien. Id.

The Initial Certified Check was deposited in Sachs & Kamhi's trust account, and on August 4, 1994, from that account, Sachs & Kamhi issued (i) a check in the amount of $235,000 made payable to Orix,[4] and (ii) a check in the amount of $35,500 made payable to the debtor. The balance of the funds were then distributed to the debtor's appraiser and to Sachs & Kamhi. The debtor deposited the $35,500 in its operating account. Stipulation ¶¶ 29, 30. In accordance with the Bill of Sale, Press–Tech's final payment was due by October 25, 1994. Post-petition, on or about November 8, 1994, Press–Tech made the $245,000 final payment by delivering the Final Certified Check which was deposited in debtor's operating account. That account is maintained at NatWest. Stipulation ¶¶ 31, 33. [The Final Certified Check, together with the $35,500 paid to debtor on August 4, 1994, constitute the "Foreclosure Proceeds".]

### Discussion

 The parties agree that to determine the extent of NatWest's interest in the Foreclosure Proceeds, we must apply various provisions of the Uniform Commercial Code, as adopted in New York State ("N.Y.U.C.C."), to the undisputed facts herein.[5] Section 9–306(2) states that

> [e]xcept where [UCC Article 9] otherwise provides, a security interest continues in collateral notwithstanding sale, exchange, or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

4. NatWest purports to reserve the right to recover the portion of the proceeds paid to Orix Credit.

5. Under New York law NatWest's unperfected security interest in the equipment is subordinate to a lien creditor whose claim arose prior to the bank's perfection of its interest. See N.Y.U.C.C. § 9–301(1)(b). Kerner, as debtor-in-possession,

has the status of a judicial lien creditor. See 11 U.S.C. § 544(a)(1). The parties agree that if NatWest did not perfect its interest in the Foreclosure Proceeds, its lien is subject to avoidance pursuant to § 544(a)(1). See also In re Howards Appliance Corp., 91 B.R. 208, 212 (E.D.N.Y. 1988); In re Karachi Cab Corp., 21 B.R. 822, 824–25 (Bankr.S.D.N.Y.1982).

N.Y.U.C.C. 9–306(2) (McKinney's 1988). As filed, NatWest's Financing Statement covered the Burmeister Equipment. *See* Stipulation ¶¶ 20, 21. Debtor asserts that by application of § 9–306(2), when NatWest consented to the sale, it terminated its security interest in the equipment and proceeds thereof. That argument finds no support in the plain and unambiguous language of the statute. *Compare United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (where a "statute's language is plain, 'the sole function of the courts is to enforce it according to its terms' ") (citation omitted). Where a secured creditor authorizes a debtor to transfer an encumbered asset free and clear of that creditor's security interest, the effect of the authorization is to nullify the creditor's interest in the collateral. *See* N.Y.U.C.C. § 9–306(2); *see, e.g., In re Bumper Sales, Inc.,* 907 F.2d 1430, 1440 (4th Cir.1990); *In re Cullen,* 71 B.R. 274, 279 (Bankr.W.D.Wis. 1987); *In re Southern Properties, Inc.,* 44 B.R. 838, 843 (Bankr.E.D.Va.1984). Nonetheless, the creditor's lien "continues in any identifiable proceeds including collections received by the debtor." N.Y.U.C.C. § 9–306(2). Among other things, the filed UCC–3 Statement evidences NatWest's consent to the sale of the equipment to Burmeister free and clear of its lien. However, because NatWest did not waive or otherwise relinquish its security interest in the equipment proceeds, its lien automatically attached to the Burmeister Chattel Paper (as the sale "proceeds", *see* N.Y.U.C.C. § 9–306(1)) upon debtor's receipt thereof. *See e.g., In re Bumper Sales, Inc.,* 907 F.2d at 1440 ("[T]he authorized disposition of the collateral has no effect upon the secured party's security interest in the proceeds of the disposition."); *In re Mid State Wood Products Co.,* 323 F.Supp. 853, 857 (N.D.Ill.1971) ("Section 9–306(2) of the Code expressly reserves the right to proceeds notwithstanding authorization to sell the primary collateral. Whether the sale was authorized … in no manner affects [the secured party's] interest in the retained proceeds."); *In re Cullen,* 71 B.R. at 279 ("[A] security interest in proceeds continues in accordance with the express language of U.C.C. § 9–306(2) regardless of a secured party's consent to sale of the collateral."); *In re Southern Properties, Inc.,* 44 B.R. at 842–43 ("The secured party remains protected [despite authorization of the sale] because the Code provides that its security interest will continue in the proceeds of the collateral."). *See also* Julian B. McDonnell, 1A *Secured Transactions Under the Uniform Commercial Code,* § 24.02[2] at 24–23 to 24–24 (Matthew Bender 1994) (hereinafter "*Secured Transactions* ") (whether intent to authorize disposition of collateral is found to be express or implied, secured party's interest continues in identifiable proceeds of the disposition); William D. Hawkland, Richard A. Lord, Charles C. Lewis, 9 *Hawkland, Lord & Lewis Uniform Commercial Code Service,* § 9–306:03 at 37 (Callaghan 1991) (hereinafter "*Hawkland* ") ("Regardless of whether the secured party authorizes disposition of the collateral, the security interest continues in the proceeds, unless the secured party also either relinquishes or waives the security interest in the proceeds."). *But see In re Quaal,* 40 B.R. 619, 621 (Bankr.D.Minn.1984) (authorization of sale of underlying collateral also eliminated security interest in proceeds); *In re Thomas,* 38 B.R. 50, 52 (Bankr.N.D. 1983) (same).

■ Whether NatWest's security interest in the sale proceeds remains *perfected* is determined by reference to N.Y.U.C.C. § 9–306(3). A secured creditor with a perfected lien in particular collateral automatically is vested with a perfected security interest in the proceeds generated from the sale thereof during the ten day period immediately following debtor's receipt of those proceeds. Thereafter, by operation of law, that interest becomes *unperfected* unless

(a) a filed financing statement covers the original collateral and the proceeds are collateral in which a security interest may be perfected by filing in the office or offices where the financing statement indicates the types of property constituting the proceeds; or

(b) a filed financing statement covers the original collateral and the proceeds are identifiable cash proceeds; or

(c) the security interest in the proceeds is perfected before the expiration of the ten day period.

N.Y.U.C.C. § 9–306(3). NatWest reasons that its interest in the Foreclosure Proceeds has been continuously perfected as follows:

(i) Pursuant to § 9–306(a), NatWest's lien, evidenced by the Financing Statement, attached to the Burmeister Chattel Paper (i.e. the proceeds from the sale of the Burmeister Equipment, *see* N.Y.U.C.C. § 9–306(1)) because (a) the Financing Statement covered the original collateral (i.e. the Burmeister Equipment) and (b) the Burmeister Chattel Paper is collateral in which a security interest may be perfected by filing in the office or offices where the original financing statement had been filed. *See* N.Y.U.C.C. §§ 9–304(1) and 9–306(3)(a).

(ii) After Burmeister defaulted under the Burmeister Note and debtor disposed of the Burmeister Equipment at the private, non-judicial foreclosure sale, NatWest's interest in the Press–Tech Account (an "account" for purposes of N.Y.U.C.C. § 9–106) and Initial Certified Check ("cash proceeds" under N.Y.U.C.C. § 9–306(1)) (together, the proceeds of the Burmeister Chattel Paper, or "second generation" proceeds of the equipment) was perfected by application of N.Y.U.C.C. § 9–306(3)(a) and § 9–306(b), respectively.

(iii) When the Press–Tech Account was liquidated by the remittance of the final payment to NatWest by means of the Final Certified Check ("cash proceeds" under N.Y.U.C.C. § 9–306(1)) and remained subject to its perfected security interest pursuant to § 9–306(3)(b) (as proceeds of the Burmeister Chattel Paper and "third generation" proceeds of the equipment).

(iv) When the Final Certified Check was deposited in debtor's operating account the funds became "fourth generation" proceeds of the equipment subject to NatWest's perfected interest pursuant to N.Y.U.C.C. § 9–306(3)(b).[6]

Debtor correctly criticizes this analysis as flawed because it erroneously assumes that upon the sale of the Burmeister Equipment NatWest's perfected security interest attached to the Burmeister Chattel Paper pursuant to N.Y.U.C.C. § 9–306(3), as "proceeds" of the equipment. NatWest maintains that as between itself and debtor, the UCC–3 Statement had no substantive impact on the reach of its lien, notwithstanding that the document states that it "releases" the Burmeister Equipment "[f]rom the Collateral described in [its] Financing Statement". *See* Stipulation Ex. A. In part, N.Y.U.C.C. § 9–406 provides that a secured party of record "*may* by his signed statement *release* all or a part of any collateral described in a filed financing statement." N.Y.U.C.C. § 9–406 (emphasis added). NatWest insists that the statement merely provides notice to third parties searching the record that they can take the equipment free and clear of its interest. As support for this restrictive interpretation of the unambiguous language in its release, NatWest seizes upon, and quotes from, the official comment accompanying § 9–406. However, the comment confirms what the statute plainly says: "[§ 9–406] provides a permissive device for noting of record any release of collateral." *See* N.Y.U.C.C. § 9–406 official comment. NatWest reads too much into the statements that "[t]here is no requirement that such a statement be filed when collateral is released" and that § 9–406 "is merely a method of making the record reflect the true state of affairs so that fewer inquiries will have to be made by persons who consult the files".

---

**6.** Debtor does not challenge NatWest's assertion that the Initial and Final Certified Checks constitute "cash proceeds" for purposes of § 9–306(1), and that together they are "proceeds" of the Burmeister Chattel Paper. It does dispute NatWest's contention that the Press–Tech Account is an "account" under § 9–106. An "account" is defined as "any right to payment for goods sold ... which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance." N.Y.U.C.C. § 9–106. The Press–Tech Account is not evidenced by an instrument (*see* UCC § 9–105(1)(i)) or chattel paper. *See* § 9–105(1)(b). Citing only the official comment to § 9–106 which references "the ordinary commercial account receivable", debtor argues, in substance, that an "account" cannot be generated by a sale of an asset unless it is done in the ordinary course of the seller's business. Neither the statutes nor the comments supports that position. Thus the Press–Tech Account is an "account" for purposes of § 9–106.

*Id.* Those provisions cannot properly be construed as meaning that as between the debtor and secured creditor a U.C.C. § 9–406 release has no substantive effect. When read in the context of the entire comment, it is clear that the drafters were contrasting the permissive/elective nature of § 9–406 with the mandatory filing requirements associated with Termination Statements under N.Y.U.C.C. § 9–404. Professor Hawkland noted the distinctions between the lien release and termination provisions of §§ 9–404 and 9–406, respectively, their relationship to the mandatory disclosure provisions of N.Y.U.C.C. § 9–208,[7] and the substantive impact of the release provisions as follows:

> In an effort to make 'the record reflect the true state of affairs (between the debtor and secured party) so that fewer inquiries will have to be made by persons who consult the files,' section 9–406 permits, but does not require, the secured party to 'release all or a part of any collateral described in a filed financing statement.' *Of course if all the collateral is released, the effect is to terminate the security interest, since no such interest can exist unless there is some collateral to which it can attach.* While 9–406 permits parties to use the release device to achieve this end, careful parties usually prefer to use a termination statement to accomplish this result, reserving the release statement for situations in which part, but not all, of the collateral is released.
>
> *If some of the collateral is released, and thereafter the parties wish to have the security interest attach to it again, an amendment is needed to reinstate it. An amendment, of course, is effective only from the date of its filing. As a consequence, some secured parties are extremely reluctant to file a release statement, preferring to protect their priority position should released collateral be brought back into the transaction at the expense of being bothered by additional requests for information authorized by section 9–208.* Obviously, this trade-off involves a business decision that must take into account the probability of the released collateral being brought back in and the extent to which authorized inquiries are likely to occur.

9 *Hawkland* § 9–406.01 at 663 (footnotes omitted) (emphasis added).[8] Upon the filing of the UCC–3 Statement, the Burmeister Equipment was released from the collateral

---

7. N.Y.U.C.C. § 9–208 states, in relevant part, as follows:

> (1) A debtor may sign a statement indicating what he believes to be the aggregate amount of unpaid indebtedness as of a specified date and may send it to the secured party with a request that the statement be approved or corrected and returned to the debtor. When the security agreement or any other record kept by the secured party identifies the collateral a debtor may similarly request the secured party to approve or correct a list of the collateral.
> (2) The secured party must comply with such a request within two weeks after receipt by sending a written correction or approval. If the secured party claims a security interest in all of a particular type of collateral owned by the debtor he may indicate that fact in his reply and need not approve or correct an itemized list of such collateral. If the secured party without reasonable excuse fails to comply he is liable for any loss caused to the debtor thereby; and if the debtor has properly included in his request a good faith statement of the obligation or a list of the collateral or both the secured party may claim a security interest only as shown in the statement against persons misled by his failure to comply. If he no longer has an interest in the obligation or collateral at the

time the request is received he must disclose the name and address of any successor in interest known to him and he is liable for any loss caused to the debtor as a result of failure to disclose. A successor in interest is not subject to this section until a request is received by him.

N.Y.U.C.C. § 9–208(1), (2).

8. What we perceive as NatWest's confusion with respect to the impact of the UCC–3 Statement may stem from the fact that, NatWest apparently overlooked a significant portion of the official comment to N.Y.U.C.C. § 9–406. In relevant part, the official comment states:

> [T]his section provides a permissive device for noting of record any release of collateral. There is no requirement that such statement be filed when collateral is released *(cf. Section 9–404 on Termination Statements).* It is merely a method for making the record reflect the true state of affairs so that fewer inquiries will have to be made by persons who consult the files.

N.Y.U.C.C. § 9–406 official comment. Notwithstanding that in its reply memorandum NatWest purported to quote that portion of the comment in its entirety, it omitted the underlined language.

described in NatWest's Financing Statement and the equipment became unencumbered by NatWest's otherwise perfected lien. Thus, the "true state of affairs" reflected by the UCC–3 Statement is that NatWest has released the Burmeister Equipment from its Financing Statement. *See Norwich Savings Society v. Independent Bank & Trust Co.,* 467 A.2d 691, 37 U.C.C.Rep.Serv. 637 (Conn.Super.Ct.1983); *Security National Bank & Trust Co. v. Dentsply Prof. Plan,* 617 P.2d 1340, 29 U.C.C.Rep.Serv. 1686 (Okla.1980); *see also* 1A *Secured Transactions* § 6B.06[1] at 6B–27 to 6B–28; 9 *Hawkland* § 9–406.01 at 663.

■ NatWest argues that even if the UCC–3 Statement released the Burmeister Equipment from its perfected lien, it nonetheless had a perfected security interest in the Burmeister Chattel Paper, as "proceeds" of the equipment, because as *originally* filed, the Financing Statement covered the equipment and the Burmeister Chattel Paper is collateral in which a security interest may be perfected by filing in the office where the Financing Statement was filed. Thus, NatWest reads the requirement in § 9–306(3)(a) that a filed financing statement "cover" the original collateral to refer to the Financing Statement as originally filed. The unambiguous language in the statute belies that interpretation. It does not refer to the lien as originally filed. Rather, it speaks of the scope of a financing statement in the present tense: "a filed financing statement *covers* the original collateral." N.Y.U.C.C. § 9–306(3)(a) (emphasis added). Moreover, NatWest's interpretation requires that we ignore subsequent lien releases, as well as modifications or amendments to—or even the termination of—a filed financing statement. We read § 9–306(3)(a) to mean that the Financing Statement must be effective as to the Burmeister Equipment as of the date the Burmeister Chattel Paper was generated. NatWest's lien on that equipment became unperfected when UCC–3 Statement was filed of record. *See* N.Y.U.C.C. § 9–406; *Norwich Savings Society v. Independent Bank & Trust Co.,* 467 A.2d at 692–93; *Security National Bank & Trust Co. v. Dentsply Prof. Plan,* 617 P.2d 1340, 29 U.C.C.Rep. Serv. 1686 (Okla.1980). Debtor is correct

that in the face of the filed UCC–3 Statement, for NatWest to have had a perfected interest in the Burmeister Chattel Paper as the "proceeds" from the sale of the Burmeister Equipment, it was required to perfect that interest "before the expiration of the ten day period [immediately following the sale of the equipment]." N.Y.U.C.C. § 9–306(3)(c). It did not do so.

■ NatWest also contends that when debtor repossessed the equipment from Burmeister, its lien reattached to the equipment as a perfected security interest under § 9–306(5)(a) and continued in the proceeds thereof pursuant to N.Y.U.C.C. §§ 9–306(3)(a) and (b). Section 9–306(5)(a) states:

> If a sale of goods results in an account or chattel paper which is transferred by the seller to a secured party, and if the goods are returned to or are repossessed by the seller or the secured party, the following rules determine priority:
>
> (a) If the goods were collateral at the time of sale for an indebtedness of the seller which is still unpaid, the original security interest attaches again to the goods and continues as a perfected security interest if it was perfected at the time when the goods were sold. If the security interest was originally perfected by a filing which is still effective, nothing further is required to continue the perfected status; in any other case, the secured party must take possession of the returned or repossessed goods or must file.

N.Y.U.C.C. § 9–306(5)(a). Burmeister purchased the equipment on or about July 31, 1992, and NatWest did not file its UCC–3 Statement of record until August 11, 1992. Stipulation ¶¶ 23, 24. Because NatWest's interest in the equipment was perfected when the equipment was sold, and debtor remained indebted to NatWest when the equipment was repossessed, NatWest's interest reattached and continued as a perfected security interest when it was repossessed. *See* N.Y.U.C.C. § 9–306(5)(a) (first sentence); 9 *Hawkland* § 9–306:07 at 66; *In re Frontier Mobile Home Sales, Inc.,* 635 F.2d 726, 729 (8th Cir.1980); *J.I. Case Co. v. Borg–Warner*

*Acceptance Corp.,* 669 S.W.2d 543, 546 (Ky. Ct.App.1984); *Finance America Corp. v. Galaxy Boat Mfg. Co., Inc.,* 292 S.C. 494, 357 S.E.2d 460, 461 (1987). However, because NatWest's interest in the Burmeister Equipment became unperfected when debtor filed the UCC–3 Statement, its deemed perfected security interest in the equipment could not continue unless either it took possession of the equipment or filed a new financing statement. *See* N.Y.U.C.C. § 9–306(5)(a) (second sentence). It failed to do so. Accordingly, even under NatWest's § 9–306(5) argument, the Burmeister Chattel Paper and proceeds thereof are unencumbered by NatWest's lien.[9]

■ As an alternative to arguing that the Burmeister Equipment is the original collateral giving rise to its perfected security interest in the Foreclosure Proceeds, NatWest contends that the Press–Tech Account and Burmeister Chattel Paper serve the same end. In substance, NatWest contends that even if its security interest did not reattach to the Burmeister Equipment pursuant to N.Y.U.C.C. 9–306(5) when the debtor repossessed the equipment, the Press–Tech Account, as an "account" generated by the resale of that equipment, became original collateral subject to its Financing Statement pursuant to the after-acquired property

clause contained therein. Debtor asserts that because NatWest failed to perfect its interest in the sale "proceeds" (i.e. the Chattel Paper), the account, as "proceeds" of the chattel paper, likewise was unencumbered by the lien. It argues that NatWest cannot cure its failure to perfect its interest in the proceeds merely by treating them as after-acquired property. In support of that position debtor cites *In re Bar C Cross Farms & Ranches, Inc.,* 48 B.R. 976 (D.Colo.1985). In that case the chapter 11 debtor was engaged in farming and ranching and, as of the filing of its petition, was indebted to Western Production Credit Association ("Western"), a secured lender, in the sum of approximately $700,000. In 1980, Western obtained liens on debtor's crops, livestock and equipment in exchange for a loan of approximately $1.4 million. Among its collateral was the wheat crop grown by debtor in Bent and Prowers Counties, Colorado. *Id.* at 977. Thereafter, debtor obtained a $185,000 low interest four year loan from Commodity Credit Corporation ("CCC") all of which it paid to Western. To obtain that loan debtor caused Western to execute a "Lien Waiver" form pursuant to which Western agreed to "waive, relinquish and surrender all right, title and interest" in "all" the wheat produced by debtor in Bent County during 1980. *Id.* at 977–78. Debtor

---

**9.** NatWest's reliance on *In re Frontier Mobile Home Sales, Inc.,* 635 F.2d 726, is misplaced. In that case the debtor, Frontier Mobile Home Sales, Inc. ("Frontier"), entered into two agreements with its lender General Electric Capital Corp., ("GECC"). In the first, GECC extended credit to Frontier for the purchase of inventory. In the second, Frontier assigned all chattel paper arising from the sale of inventory to GECC. *Id.* at 727. Frontier sold a mobile home to a purchaser and assigned the chattel paper arising therefrom to GECC, which perfected its interest by duly noting its lien on the certificate of title. The purchaser subsequently defaulted, Frontier repossessed the home and returned it to its lot and sold it postpetition. *Id.* GECC claimed that it was entitled to the sale proceeds. The lower courts held that pursuant to § 9–306(5)(a), GECC's perfected security interest reattached to the collateral upon its repossession, and consequently that GECC's interest extended to the proceeds. *Id.*

On appeal the Trustee argued that by acquiring a lien under the chattel paper, GECC forfeited or subrogated its perfected security interest in the collateral. *Id.* at 727–28. The Trustee further

contended that GECC could only assert this second interest which the Trustee viewed as unperfected and therefore inferior to his own. *Id.* at 728. The Eighth Circuit rejected the Trustee's view and affirmed the lower courts, holding that GECC's interest in the proceeds was superior to the Trustee's interest, notwithstanding the chattel paper lien in the collateral, because GECC's interest in the chattel paper did not supplant its inventory security interest in the proceeds. The court disagreed with the Trustee's position that the security interests were interchangeable. The court explained that after the sale, GECC's inventory security interest attached to the *proceeds* by virtue of UCC § 9–306(2) and was effective against *Frontier,* while its chattel paper security interest attached to the *collateral* and was effective against the *purchaser. Id.* at 729. Upon repossession, GECC's perfected security interest in the inventory reattached to the collateral. When it was subsequently resold, the interest shifted again to the proceeds. *Id.* We believe that the *Frontier Mobile Home* court reached the correct result. It is inapposite here, however, because our facts differ in at least one very significant way. NatWest released its collateral from its perfected security interest.

repaid the CCC loan ahead of schedule and became eligible for a rebate program pursuant to which 20% of the wheat tendered to CCC was returned to and sold by debtor. One issue was whether Western could assert an interest in the rebated wheat. *Id.* at 978. Western argued that the waiver merely subordinated its lien in the wheat to that granted CCC such that once CCC was paid in full its first lien was reinstated. *Id.* at 978–79. The court rejected that argument finding that the language of the waiver clearly and unambiguously provided that Western had relinquished any and all rights in the wheat. *Id.* at 979. Alternatively, Western contended that even if the waiver canceled its security interest in the wheat, that interest reattached to the rebated wheat pursuant to the "after-acquired property clause" contained in the security agreement. *Id.* The court found the after-acquired property clause "inapplicable to the proceeds of previously released collateral because there is no longer a foundation upon which the after-acquired security interest may attach." *Id.* It reasoned that "[t]he purpose of an after-acquired security clause is to maintain the continuity of a secured interest even though the collateral may change form" and that "[w]hen the secured interest has been relinquished, the chain is broken and the proceeds of the collateral are also released." *Id.* *Bar C* is distinguishable because NatWest did not relinquish all of its rights in the Burmeister Equipment. It consented to the sale of the equipment (and thereby terminated its security interest therein, *see* N.Y.U.C.C. § 9–306(2)) and by filing the UCC–3 Statement caused its otherwise perfected interest in the sale proceeds to become unperfected. NatWest retains a lien (albeit, an unperfected lien) on the proceeds. Whereas *Bar C* involved a substitution of secured creditors (CCC for Western), this case involves the sale of property. Moreover, *Bar C* may actually support NatWest's argument. The

Press–Tech Account arguably could be viewed as after-acquired property because NatWest has not relinquished its lien and the account is merely NatWest's collateral in a changed form. *See* 48 B.R. at 979. We need not resolve that issue, however, because we find merit to NatWest's claim that through the Assignment, it holds a perfected lien in the Burmeister Chattel Paper as *original* collateral pursuant to the after-acquired property clause contained in the Financing Statement. From that, NatWest correctly argues that its interest in the Foreclosure Proceeds is perfected under N.Y.U.C.C. §§ 9–306(3)(a) and (b). Section 9–302(2) states that "[i]f a secured creditor assigns a perfected security interest, no filing under [the UCC] is required in order to continue the perfected security interest against creditors of and transferees from the original debtor." *See* N.Y.U.C.C. § 9–302(2). Debtor had perfected its interest in the Burmeister Note and Burmeister Lien when it effected the Assignment. Accordingly, NatWest stepped into debtor's shoes as a perfected secured creditor of Burmeister. *See, e.g., In re Frontier Mobile Home Sales, Inc.,* 635 F.2d at 729; *In re Heritage House Interiors, Inc.,* 122 B.R. 605, 609 (Bankr.M.D.Fla.1990). As to debtor and its creditors, however, NatWest's interest in the Burmeister Chattel Paper was not automatically perfected. NatWest was required to take appropriate steps under the U.C.C. to perfect that interest. *See Geeslin v. Blackhawk Heating & Plumbing Co. Inc.,* 80 Ill.App.3d 179, 35 Ill.Dec. 226, 232, 398 N.E.2d 1176, 1182 (1979).[10] "A security interest in chattel paper . . . may be perfected by filing." N.Y.U.C.C. § 9–304(1). A filed financing statement is sufficient to perfect an interest in collateral if, among other things, it "contains a statement indicating the types, or describing the items, of collateral." N.Y.U.C.C. § 9–402(1). With exceptions not relevant here, "a security

---

**10.** The example found in the official comment 7 to § 9–302(2), as modified for purposes of this case, is particularly instructive:

> [Burmeister] buys goods from [debtor] who retains a security interest in them which he perfects. [Debtor] assigns the security interest to [NatWest]. The security interest, in [NatWest's] hands and without further steps on

> [NatWest's] part, continues perfected as to [Burmeister's] transferees and creditors. If, however, the assignments from [debtor] to [NatWest] was itself intended for security . . . [NatWest] must take whatever steps may be required for perfection in order to be protected against [debtor's] transferees and creditors.

*See* N.Y.U.C.C. § 9–302(2) official comment 7.

agreement may provide that any or all obligations covered by the security agreement are to be secured by after-acquired collateral". N.Y.U.C.C. § 9–204(1). *See also* N.Y.U.C.C. § 9–402(1) ("[a] financing statement may be filed before a security agreement is made or a security interest otherwise attaches"). Under New York law, when a financing statement is in general terms and apparently intends to apply to existing and after acquired property it has a broad effect. *See Allis–Chalmers Credit Corporation v. Bank of Utica,* 110 Misc.2d 283, 286, 441 N.Y.S.2d 852, 854 (Sup.Ct.1981). So long as the financing statement provides proper notice to subsequent parties that a security interest in after acquired property is claimed, it effectively perfects the secured creditor's interest in that property. *Id.* NatWest has a valid, perfected, and enforceable security interest in all of the debtor's after-acquired property including after-acquired chattel paper. Stipulation ¶¶ 20–22.

The Assignment vested NatWest with a security interest in the Burmeister Chattel Paper, as original collateral, separate and apart from its interest therein as "proceeds" of the Burmeister Equipment. The interest was perfected by virtue of the after-acquired property clause in the Financing Statement. *See, e.g., Smith v. Mark Twain National Bank,* 805 F.2d 278, 286 (8th Cir.1986) (bank's interest in certificates of deposit and repurchase agreements which came into existence after security agreement created constituted perfected after-acquired property because security agreement described such assets as bank's collateral and also provided that the bank would have an interest in assets subsequently obtained by debtor); *United States v. Fullpail Cattle Sales, Inc.,* 640 F.Supp. 976, 981 (E.D.Wis.1986) (secured creditor had interest in entire dairy herd because security agreement adequately described existing cattle and also provided for interest in cattle subsequently acquired together with all increases, replacements, substitutions and additions thereto); *see also* 8 *Hawkland* § 9–204:01 at 752–53.

By application of § 9–306(3)(a) and (b), NatWest's perfected security interest continued in the Press–Tech Account and

Initial and Final Certified Checks. Cash proceeds like the checks remain identifiable, and thus subject to a perfected security interest, if they have been segregated by debtor and the secured creditor has supervised the debtor's possession of the proceeds or, alternatively, when they have been commingled with other funds, if the secured party is able to identify them using equitable tracing rules. *See* N.Y.U.C.C. § 9–304; *see also* 9 *Hawkland* § 9–306:04 at 50. Those proceeds have not been deposited in a segregated account. However, it is undisputed that the funds in debtor's operating account, other than the Foreclosure Proceeds, are subject to NatWest's lien. Stipulation ¶ 32. Because the Foreclosure Proceeds constitute identifiable cash proceeds, NatWest's perfected security interest continues to attach to them pursuant to § 9–306(3)(b).

*Conclusion*

Based on the foregoing, NatWest's cross-motion is granted.

SETTLE ORDER.