In re CHURCHILL MORTGAGE INVESTMENT CORP., Debtor.

Bankruptcy No. 97 B 20967(ASH).

United States Bankruptcy Court, S.D. New York.

April 20, 1999.

Serchuk & Zelermyer, LLP, White Plains, NY, for Barbara Balaber-Strauss, Chapter 7 Trustee.

Morrison Cohen Singer & Weinstein, LLP, New York City, for Official Committee of Unsecured Creditors.

Harold B. Tevelowitz, Valhalla, NY, for objectants.

### DECISION ON MOTION FOR SUMMARY JUDGMENT

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

At issue on this motion for summary judgment is the disputed entitlement to real property located at 24 William Street, Ossining, New York (the "Property"), legal title to which was acquired by Churchill Mortgage Investment Corp. ("CMIC" or

the debtor) upon its foreclosure of a mortgage it held against the Property. Upon an application by the Chapter 7 Trustee (the "Trustee") to sell the Property, eight investors (the "Objectants") claimed a superior ownership interest in the Property through devolution of certain fractional interests in the underlying note and mortgage purportedly assigned to them. On the documents and facts stipulated by the parties, I conclude that the Objectants' claims are for unsecured loans to the debtor, and that they have no right to or property interest in the underlying note and mortgage or the Property itself. Further, even if the Objectants, as collateral assignees, could be deemed to hold secured interests in the Property as proceeds of the foreclosed mortgage, such interests are unperfected and subordinate to the Trustee's rights as hypothetical lien creditor under 11 U.S.C. § 544(a).

### Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the standing order of reference of Acting Chief Judge Robert J. Ward dated July 10, 1984. This adversary proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(K) and (N).

### Procedural Background

On April 17, 1997 an involuntary petition for relief under Chapter 7 was filed against CMIC and an order for relief was entered on June 23, 1997. Also on June 23, 1997 and later on June 27 and July 2, a related series of entities filed voluntary petitions for relief under Chapter 7. By orders entered July 21 and July 31, 1997 the cases were procedurally consolidated and jointly administered. CMIC is one of the related debtor entities.

On February 9, 1998 the Trustee served a Notice of Intent to sell the Property. The Objectants opposed the Trustee's application. The real issue, however, is not whether the Property should be sold (all agree that it should), but who is entitled to the proceeds—the Objectants for their own account or the Trustee for the account of the debtor's estate.

The parties, having submitted memoranda and a joint statement of undisputed facts and documents, consent to treat this matter as a motion for summary judgment under Bankruptcy Rule 7056(d).

### Factual Background

CMIC is one of several debtor companies owned or controlled by Gerald Hirsch which invested in real estate in New York. The Court takes judicial notice of the pervasive allegations throughout these Chapter 7 proceedings that Gerald Hirsch (who was indicted and has pleaded guilty to certain charges in the United States District Court for the Southern District of New York) operated the debtor entities in a manner analogous to a "Ponzi scheme." It is alleged, in substance, that numerous persons were induced to loan money to or invest money in the debtor entities in the belief that the loans or investments were secured or backed by real estate or real estate mortgages when, in fact, there were not. The instant contested matter is but one of many similar controversies between the Trustee and particular groups of investors or lenders with respect to rights in specific pieces of real property.

In mid-January 1990 eleven investors (the "Original Investors") contributed a total of $84,500 to CMIC which placed the funds as they were received in CMIC's main bank account commingled with other funds. On January 26, 1990 CMIC loaned $84,500 to Lawrence and Nanette Fullwood, who executed a note (the "Fullwood Note") in favor of CMIC in the principal amount of $84,500 secured by a mortgage on the Property in favor of CMIC (the "Fullwood Mortgage"). In April 1991 the Fullwoods defaulted on the Note. In October 1991 CMIC commenced an action to foreclose the Fullwood Mortgage captioned "on behalf of" all eleven of the Original Investors, resulting in an amended judgment of foreclosure and sale on July 7, 1993. In December 1993 CMIC purchased the Property at the foreclosure

auction for $1,000. The amount then outstanding on the Fullwood Note and Mortgage was $106,761.92. The referee's sale deed, which was never recorded, was made out in the name of CMIC only.

The eleven Original Investors funded their investments in CMIC variously in $4,500, $5,000 or $10,000 amounts. The investments were for one- or two-year terms and were renewed annually. Each Original Investor's relation with CMIC was governed by an "Investor's Agreement," described more fully below. The Original Investors received from CMIC purported assignments (the "Assignments") of their fractional interests in the Fullwood Note and Mortgage and the Assignments were filed with the County Clerk. Each of the Original Investors received a certificate entitled "Mortgage Note," exemplified as follows:

NUMBER  00127-3    **MORTGAGE NOTE**    AMOUNT $5,000.00

**CHURCHILL MORTGAGE INVESTMENT CORPORATION**
THIS IS TO CERTIFY THAT       P.B.A. of Pleasantville, Inc.          #13-2999596
Attn: Mark Cestaro, PO Box 41, Pleasantville, N.Y. 10570          IS THE OWNER OF
A      $ FIVE THOUSAND      13  % MORTGAGE NOTE DUE      January 26, 1991
$      54.17      INTEREST IS PAYABLE MONTHLY.  PROPERTY LOCATED AT
                  24 Williams Street, Ossining, N.Y. 10562
APPRAISED VALUE      $140,000.00.
There will be a substantial penalty for early withdrawals.  In case of loss or destruction hereof payment of the issuance of a new certificate will be made by us only when furnished with indemnity satisfactory to it.
Dated          January 26, 1990                          /s/
                                                              President
                  Mail Monthly Interest.

Seven of the Original Investors are objectants on this motion. The other four Original Investors received full repayment of their investments in January and February 1991, January 1992 and October 1995. Three of the Objectants made additional investments totaling $19,500 and received Mortgage Notes referencing the Property, two of which were made in January 1992, after the default on the Fullwood Mortgage. The eighth Objectant, Joan D. Lewis as Trustee of Devlin Graphics Industries ("Devlin Graphics"), invested $10,000 with CMIC and received a Mortgage Note referencing the Property.[1] In addition, Helen Mech, a non-party investor, invested $44,000 with CMIC in January 1995 and received a mortgage renewal note referencing the Property. CMIC did not execute assignments with respect to the subsequent investments by the three Objectants, Devlin Graphics or Helen Mech (the "Subsequent Investors").

CMIC never told any of the Investors about the Fullwoods' default or the foreclosure sale. Although the Fullwoods defaulted in April 1991, CMIC did not default in its obligations to any of the Original or Subsequent Investors until February 1997, almost six years later. Thus, CMIC repaid the principal on their loans to four Original Investors when demanded and paid monthly interest to all of the Investors on their outstanding loans through January 1997. The annually adjusted interest rates paid to the Investors ranged from a high of 13% at the outset to a low of 8%. The interest rate under the Fullwood Note was 17%.

1. At the oral argument on this matter counsel for the Objectants stated that Devlin Graphics had no claim to the Property because the interest was acquired after the date of the foreclosure.

### Discussion

Objectants argue, alternatively, either that they were outright owners by assignment of the Fullwood Mortgage, or that they were pledgees of and had a security interest in the Fullwood Mortgage. In either case, Objectants assert that CMIC (and, therefore, the Trustee) held the Fullwood Mortgage and, after foreclosure, the Property in a relationship of trust for the account of Objectants. The Trustee contests Objectants' alternative claims of ownership or secured party status and, further, maintains that the Objectants' putative security interest was unperfected and therefore subordinate to the Trustee's position under 11 U.S.C. § 544 as hypothetical lien creditor. Each of these positions will be examined.

Preliminarily, it is important to take note of the obvious. Objectants do not claim that they were granted title to or a security interest in *the Property* by either the Fullwoods or by CMIC. There is no such document. The Objectants' claim to the Property derives from and depends upon their alleged interests in the Fullwood Note and Mortgage. The claim is that by reason of the recorded Assignments to the Original Investors from CMIC, CMIC granted the Original Investors either an ownership interest or a security interest in the Fullwood Note and Mortgage, which interest attached to the Property after the Mortgage was foreclosed.

It is also significant that the Fullwoods owed no obligation to the Investors, only CMIC did. The Fullwood default in 1991 was not a default as to the Objectants. Thus, the Objectants lack a fundamental predicate to their claim—a default by CMIC in its payment obligations to the Investors at any time before the foreclosure. Objectants could not have exercised any right of foreclosure against the Property based on the Assignments to them of the Fullwood Mortgage because CMIC maintained its payment obligations to all the Investors through January 1997, more than three years after the foreclosure of the Fullwood Mortgage.

### The Investors as Owners

■ Objectants' position on their claim of ownership of the Fullwood Mortgage is stated as follows:

In January 1990, Objectants or their predecessors in interest paid Churchill $84,500 specifically to be loaned to the Fullwoods in exchange for the assignments of 100% of the Fullwood Mortgage. The money was earmarked[2] for the Fullwood Mortgage Loan and as part of this transaction, it was required and agreed that the Fullwood Mortgage be contemporaneously assigned to Objectants. The assignments to Objectants or their assignors of 100% of the Fullwood Mortgage were recorded on the same date that the Fullwood Mortgage was recorded.

Objectants' Memorandum at unnumbered page 3.[3] The problem with Objectants' ownership claim is that it is confounded by the documents and the conduct of the parties, notwithstanding the Assignments.

Each Original Investor received a "Dear Friend" letter saying "Thank you for investing with churhill [sic]" and requesting the Investor to sign and return the Investor's Agreement. This Agreement con-

---

2. Although the Investor's Agreement provided, ambiguously, in paragraph 5 that "In no way will proceeds be co-mingled with any other funds or used for any other purpose other than for financing mortgages," it is stipulated that the $84,500 advanced by the Original Investors was placed in a general, commingled bank account of CMIC, as were the investments of the Subsequent Investors.

3. Objectants do not address such issues as their respective percentage ownership interests in the Fullwood Mortgage/Property or the consequences to those percentage interests, if any, resulting from the subsequent principal repayments to four of the Original Investors, or the later investments by the Subsequent Investors. All five Subsequent Investors received a Mortgage Note referencing the Property, but none received an Assignment.

tains a number of provisions which contradict Objectants' claim of ownership of the Fullwood Mortgage. For example:

- The signing Investor is defined as "Lender," which could only mean a lender to CMIC.

- Paragraph 1 provides that "Churchill, at its sole option, may offer to the Lender, loans which would be collaterally secured by a mortgage on specific real property." The import of this language is that Lender's loans to CMIC would be collaterally secured by mortgages, not that Lender would have an ownership interest in any mortgages.

- Paragraph 4 provides that upon making "the investment into the Churchill mortgage note" Churchill would remit to the Lender within thirty days "the monthly payment due according to the terms of the mortgage loan." The terms "mortgage note" and "mortgage loan" can only have referred to the "Mortgage Note" exemplified above, which was an obligation of CMIC, not of the underlying mortgagors, the Fullwoods.

- Paragraph 6 provides that "[i]n no event will the Lender be required to advance any additional funds for any purpose whatsoever" and concludes, "Churchill unconditionally guarantees the on-time monthly interest payment to the Lender, even in case of payment delays by the Borrower, and the on-time return of principal."

- Paragraph 8 provides that "Churchill expressly guarantees that Lender shall not suffer any loss of principal or interest with regard to any mortgage loans made or purchased by Lender."

- Paragraph 13 provides that "Investment will be for a predetermined period of 12 months."

While it contains many ambiguities and is a virtual archetype of bad (or misleading) draftsmanship, the Investor's Agreement demonstrates unambiguously that the party signing it was a lender to CMIC, and not an owner of a percentage interest in the Fullwood Mortgage. The so-called Mortgage Note, referred to in the Investor's Agreement, confirms this. The Mortgage Note was issued by and constituted an obligation of CMIC. The Mortgage Note was for a term of one year and carried an interest rate of 13%, and it is stipulated that the interest rate paid by CMIC diminished annually after the first year to a low of 8%. By contrast, the Fullwood Mortgage was for a three-year term at 17% interest. The Investor's Agreement guaranteed timely interest payments, notwithstanding payment delays by the "Borrower," and guaranteed that the "Lender" would not suffer any loss of principal or interest. Indeed, CMIC repaid principal to four of the eleven Original Investors and continuously paid interest under the Mortgage Notes to all of the Investors through January 1997, notwithstanding the Fullwoods' default in 1991.

These facts simply cannot be reconciled with the Objectants' contention that they were the owners of their respective percentage interests in the Fullwood Mortgage. The Mortgage Note did contain a cryptic reference to "Property located at 24 Williams Street, Ossining, N.Y. 10562," which might have induced a lay investor to think he was acquiring some interest in the Property. But neither the Mortgage Note nor the Investor's Agreement contains any language purporting to convey title to or the right of ownership in the Fullwood Mortgage or the underlying Property from CMIC to the Original Investors. CMIC retained not only possession of and legal title to the Fullwood Note and Mortgage and, after foreclosure, the Property, but all risks and rights of ownership. The Investors shared none of the risk (*i.e.,* default, potential loss in value of the Property) and enjoyed none of the rewards (*i.e.,* 17% interest rate, three-year term, potential gain in value of the Property) inherent in the Mortgage or the Property.

Any question of ownership of the Fullwood Mortgage is eliminated by the case law. A case involving almost identical facts, cited by both the Objectants and the Trustee, is *In re Sprint Mortgage Bankers Corp.*, 164 B.R. 224 (Bankr.E.D.N.Y.1994) ("*Sprint Mortgage I*"), aff'd, 177 B.R. 4 (E.D.N.Y.1995) ("*Sprint Mortgage II*"). As stated by the District Court on appeal in *Sprint Mortgage II*, 177 B.R. at 5–6, the debtor was in the business of making loans to various borrowers ("mortgagors") using funds obtained from third-party investors ("lenders"). In return for their funds, the debtor through its principal, Hyman Gaines, promised that the lenders' funds would be invested in interests in mortgages and secured by assignment to the lenders of the underlying notes and mortgages. In addition, Mr. Gaines personally guaranteed repayment of the lenders' loans. The assignments of the mortgage interests to the lenders were recorded, but the mortgages and notes were retained by the debtor.[4]

The issue in *Sprint Mortgage I* was whether the notes and mortgages were property of the debtor's estate pursuant to the broad provisions of 11 U.S.C. § 541(a) or whether they had been validly assigned to the lenders as participants in the secondary mortgage market, thereby excepting them from inclusion in the debtor's estate pursuant to 11 U.S.C. § 541(d). The Bankruptcy Court in *Sprint Mortgage I* stated that the exception contained in Section 541(d) applied only to "actual participants in the secondary mortgage market," *i.e.*, where there was an actual sale of all or part of a mortgage in the secondary market, and not to "mere loans." 164 B.R. at 228. Taking note of the numerous incongruities between the obligations running from Sprint Mortgage and its principal to the lenders and the obligations of the underlying mortgagor to Sprint Mortgage as mortgagee (virtually indistinguishable from the incongruities noted above in

this case), the Bankruptcy Court in *Sprint Mortgage I* concluded that the lenders' investments "were disguised loans rather than true loan participation agreements" *id.* at 229, and that "[a]s a result, the Plaintiffs cannot rely on the protection of Section 541(d) with regard to the mortgage assignments, nor can they rely on the New York State law corollary [New York Real Property Law § 275] to Section 541(d) of the Code." *Id.*

Another case providing helpful analysis is *In re Coronet Capital Company*, 142 B.R. 78 (Bankr.S.D.N.Y.1992) involving a similar issue under Section 541(d) of the Bankruptcy Code and similar facts. Citing *Hutchins, What Exactly is a Loan Participation?*, 9 Rut.Cam.L.J. 447, 460 (1978), Bankruptcy Judge Conrad identified the following "factors indicating an intention to create a loan instead of a participation" (142 B.R. at 80):

(1) guarantee of repayment by the lead lender to a participant;

(2) participation that lasts for a shorter or longer term than the underlying obligation;

(3) different payment arrangements between borrower and lead lender and lead lender and participant; and

(4) discrepancy between the interest rate due on the underlying note and interest rate specified in the participation.

To the same effect, *see In re Woodson Co.*, 813 F.2d 266, 270–72 (9th Cir.1987); *In re Corporate Financing, Inc.*, 221 B.R. 671, 678–79 (Bankr.E.D.N.Y.1998); *Sprint Mortgage I*, 164 B.R. at 228–29; *In re Sackman Mortgage Corp.*, 158 B.R. 926, 933 (Bankr.S.D.N.Y.1993) (citing *In re Lendvest Mortgage, Inc.*, 119 B.R. 199 (9th Cir. BAP 1990)); and *In re S.O.A.W. Enterprises*, 32 B.R. 279, 282–83 (Bankr. W.D.Tex.1983).

The Objectants in this case, as putative assignees of fractional interests in the

---

4. Like Gerald Hirsch, the principal of CMIC, the debtor's principal in *Sprint Mortgage*, Hyman Gaines, was indicted and pleaded guilty for his role in the Sprint Mortgage collapse.

Fullwood Mortgage by reason of the recorded Assignments, clearly fail all of the tests identified by the courts in *Sprint Mortgage I, Coronet Capital, Corporate Financing* and the other decisions noted above which have considered the rights and status of competing claimants under Sections 541(a) and 541(d) of the Bankruptcy Code and Section 275 of the New York Real Property Law. All four of the factors quoted above from *Coronet Capital* apply in this case.

As a matter of fact and law, the Original Investors had no ownership interest in the Fullwood Mortgage—their sole interest resulting from their investments in CMIC was that of a lender to CMIC. Since the Original Investors including the Objectants had no ownership interest in the Fullwood Mortgage, they had no ownership interest in the Property which was the subject of the Fullwood Mortgage either before or after the foreclosure sale.

### The Effect of the Foreclosure

Objectants advance a theory of ownership of the Property based on CMIC's foreclosure of the Fullwood Mortgage. Objectants assert that "they and not the Trustee are the lawful owners of the William Street Property because they were the pledgees of a mortgage directly encumbering the William Street Property and because that mortgage was successfully foreclosed on their behalf." Objectants' Memorandum at unnumbered p. 2. "As a result, the Fullwood Note and Mortgage ceased to have any legal significance. Hence, the analysis under Article 9 as to whether the Objectants had perfected their security interests in January 1990 by possession of the Note is unnecessary." *Id.* at 3. The syllogism, if comprehensible at all, does not withstand analysis.

The fact that CMIC commenced the foreclosure action under a caption labeled "On behalf of" the eleven Original Investors (without regard to the four Original Investors whose loans to CMIC were fully repaid, or the loans to CMIC by the five Subsequent Investors who also re-

ceived Mortgage Notes referencing the Property) does not mean that the Original Investors or the Objectants obtained ownership of or legal title to the Property, *because in fact they did not.* The undisputed fact is that the foreclosure deed of sale was issued to and in the name of CMIC alone. None of the Original or Subsequent Investors had any knowledge of the foreclosure or of the Fullwoods' default under their Note and Mortgage.

The significant fact that this argument overlooks is that CMIC never defaulted in its obligations to the Objectants or any of the other Investors until February 1997, almost six years after the Fullwoods defaulted and more than three years after CMIC took title to the Property upon the foreclosure sale. Objectants could have no rights with respect to CMIC's foreclosure of the defaulted Fullwood Mortgage because CMIC did not default in the performance of any of its obligations to any of the Original or Subsequent Investors until February 1997, long after CMIC acquired title to the Property in December 1993.

CMIC's foreclosure of the Fullwood Mortgage was simply irrelevant to the Investors' rights against CMIC under the Investor's Agreement and the Mortgage Note. By no stretch of the legal imagination can the foreclosure of the Fullwood Mortgage be transmogrified into ownership rights in the Property by Objectants superior to rights of the Trustee and this debtor's estate.

### The Investors as Secured Parties

As an alternative to outright ownership by assignment, Objectants argue that they had a security interest in the Fullwood Mortgage asserting:

Let us assume *arguendo* that the Trustee is correct and that this was not an outright assignment, but a collateral assignment. In that event, New York law considers the Objectants to be pledgees and Churchill a pledgor of the Fullwood Note and Mortgage.

Objectants' Memorandum at unnumbered page 4. They further contend that *Sprint Mortgage I* "recognizes that under New York law, Objectants received a security interest in the Fullwood Note and Fullwood Mortgage." *Id.* at 2.

While the matter is not free from doubt, for purposes of decision this Court will assume, without deciding, that the purpose and effect of the Investor's Agreement and the recorded Assignments was the grant by CMIC to the Original Investors of a security interest in the Fullwood Note and Mortgage. It will further be assumed that the Property may be regarded as the proceeds of CMIC's foreclosure of the Fullwood Note and Mortgage.

■ The threshold issue, then, is whether the Objectants' security interest in the Fullwood Note and Mortgage was converted to a security interest in the Property as proceeds of the foreclosed Fullwood Mortgage. The answer turns on Section 9–306(3) of the New York Uniform Commercial Code, under which no security interest attaches to proceeds unless the security interest in the foreclosed collateral was perfected. The statute provides, in pertinent part:

> The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected. . . . Except as provided in this section, a security interest in proceeds can be perfected only by the methods or under the circumstances permitted this Article for original collateral of the same type.

McKinney's Uniform Commercial Code § 9–306(3). *See In re Kerner Printing Co., Inc.,* 178 B.R. 363, 367–70 (Bankr. S.D.N.Y.1995) (continuation of security interest in proceeds following foreclosure sale governed by UCC 9–306(2), but perfection of such interest is governed by UCC 9–306(3)).[5]

■ The governing law on the question whether a security interest in a promissory note and mortgage is perfected is to be found in Sections 9–304(1) and 9–305 of the Uniform Commercial Code. Section 9–304(1) provides, in pertinent part, as follows:

> (1) . . . a security interest in . . . instruments . . . can be perfected only by the secured party's taking possession. . . .

*Id.* § 9–304(1). Section 9–305 provides, in pertinent part:

> A security interest in . . . instruments . . . may be perfected by the secured party's taking possession of the collateral. . . . A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained. . . .

*Id.* § 9–305. In the case of a collaterally assigned note, the assignee must take possession of the note in order to perfect its security interest in the instrument. *See Sprint Mortgage I,* 164 B.R. at 227; *Sprint Mortgage II,* 177 B.R. at 7; and *In re Stockbridge Funding Corp.,* 145 B.R. 797, 808 (Bankr.S.D.N.Y.1992) *aff'd in part, rev'd in part,* 158 B.R. 914 (S.D.N.Y. 1993).

In this case, there is no dispute that the Original Investors never took possession of the Fullwood Note and Mortgage. As a consequence, even assuming that a valid security interest attached, no such interest was ever perfected under UCC §§ 9–304(1) and 9–305. Because they did not have a perfected security interest in the collateral, the Original Investors thus did not obtain a security interest in the Property as proceeds of the collateral under UCC § 9–306.

Objectants' argument that "since this Court is being asked to decide the rights of the parties to real property, UCC Article 9 is inapplicable" (Memorandum at un-

---

**5.** Section 9–306(2) provides in pertinent part, " . . . a security interest continues in collateral notwithstanding sale . . . or other disposition

. . . and continues in any identifiable proceeds."

numbered p. 2) has been considered and expressly rejected by the courts. *See Sprint Mortgage II*, 177 B.R. at 7 and cases cited therein, *aff'g, Sprint Mortgage I*, 164 B.R. at 229; *In re Stockbridge Funding*, 145 B.R. at 807–08; *Bank of Tokyo Trust v. Urban Food Malls, Ltd.*, 229 A.D.2d 14, 23–24, 650 N.Y.S.2d 654, 661–62 (1st Dep't 1996); *see also In re Sackman Mortgage Corp.*, 158 B.R. at 938 (notice provisions of New York Real Property Actions and Proceedings Law held inapplicable to Article 9 foreclosure sale since under UCC 9–102(3), "[t]he application of [the UCC] to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this Article does not apply").

■ Although ultimately we are concerned here with real property, the issue turns upon whether the Objectants have a security interest in the proceeds of a foreclosed mortgage, and that issue turns on whether the Objectants had a perfected security interest in the Fullwood Mortgage and Note which are personalty governed by Article 9 of the UCC. Although the UCC does not apply to security interests in real estate, *see* UCC § 9–104(j), Article 9 does apply where a note and mortgage (*i.e.*, "instruments") are the collateral which is pledged to secure a debt. *See* UCC § 9–102(2) and Official Comment 4 thereto, which states that "when the mortgagee pledges the note to secure his own obligation to X, this article applies to the security interest thus created, which is a security interest in an instrument even though the instrument is secured by a real estate mortgage."

To summarize, even assuming that Objectants had a valid lien against the Fullwood Mortgage to secure their loans to CMIC, that lien did not and could not attach to the Property as proceeds of the Fullwood Mortgage as a matter of law. Objectants' alleged security interests in the Fullwood Mortgage were governed by Article 9 of the Uniform Commercial Code

under UCC § 9–102(3). Section 9–306 provides that Objectants' security interest in the Fullwood Mortgage attached to the Property as proceeds only if the security interest in the Mortgage was perfected. Under UCC §§ 9–304(1) and 9–305 a security interest in an instrument such as a mortgage is perfected only by taking possession of the instrument. Since Objectants never took possession of the Fullwood Note and Mortgage, their security interest in the Note and Mortgage was never perfected and, accordingly, did not attach to the Property as proceeds.

### The Effect of Bankruptcy Code Section 544(a).

■ Even if one were to assume, contrary to fact and law, that Objectants' putative security interest in the Fullwood Mortgage attached to the Property as proceeds of the foreclosure sale, the Trustee's right to the Property nevertheless would be superior to that of Objectants by reason of 11 U.S.C. § 544(a).

Section 544(a) in effect gives the Trustee the same power to avoid Objectants' putative lien on the Property as a hypothetical creditor who obtained a judicial lien on the Property at the time of commencement of the debtor's Chapter 7 case. Of course, a judicial lien creditor who became such on the date of filing could not avoid a prior lien which was perfected. But the hypothetical judicial lien creditor most certainly could avoid a preexisting but unperfected security interest in the debtor's Property.

Under the New York Real Property Law § 291, a security interest in real property can be perfected only by filing written notice with the Clerk of the County where the property is located so that the lien may be publicly recorded, giving notice of the encumbrance to potential purchasers or future creditors. Notice of Objectants' putative security interest in the Property as proceeds of the Fullwood Mortgage was never filed with the County Clerk's office.

Accordingly, the Trustee would have the power under Section 544(a) to avoid the Objectants' security interest in the Property, if Objectants had any such security interest.

\* \* \*

Objectants never had ownership of or legal title to the Property. They had no contractual relationship with the Fullwoods. They had no right to ownership of or legal title to either the Fullwood Mortgage or the Property under the Investor's Agreement and the Mortgage Note, which defined their rights respecting their loans to CMIC. To the extent that the Original or Subsequent Investors had any equitable or other right or expectation as against CMIC with respect to the Property, that equitable right or expectation as against CMIC with respect to the Property, that equitable right or expectation did not mature until CMIC's default in February 1997. Assuming that the Investors' undocumented equitable right or expectation with respect to the Property could somehow be characterized as a security interest, that security interest was unperfected, unknown and unknowable to the world at large, and it would be subject to the Trustee's power of avoidance under 11 U.S.C. § 544(a).

Counsel for the Trustee is directed to settle an order disposing of this contested matter in a manner consistent with this decision.