[650 NYS2d 654]

BANK OF TOKYO TRUST COMPANY, Respondent, v URBAN FOOD MALLS LTD. et al., Appellants, et al., Defendants.

BANK OF TOKYO TRUST COMPANY, Respondent-Appellant, v URBAN FOOD MALLS LTD. et al., Defendants, and LEX-86 REALOPP CORP. et al., Appellants-Respondents. FRITZ W. ALEXANDER, II, as Receiver, Respondent-Appellant.

BANK OF TOKYO TRUST COMPANY, Appellant, v URBAN FOOD MALLS LTD. et al., Defendants, and LEX-86 REALOPP CORP. et al., Respondents. FRITZ W. ALEXANDER, II, as Receiver, Appellant.

BANK OF TOKYO TRUST COMPANY, Respondent, v URBAN FOOD MALLS LTD. et al., Defendants, and LEX-86 REALOPP CORP. et al., Appellants.

First Department, December 3, 1996

## APPEARANCES OF COUNSEL

*Jonathan D. Siegfried* of counsel *(Laura E. Longobardi, Lorraine S. McGowen* and *Michael B. Carlinsky* on the brief; *Reid & Priest, L. L. P.,* and *Orrick, Herrington & Sutcliffe,* attorneys), for Bank of Tokyo Trust Company.

*David C. Segal* of counsel *(June Diamant* on the brief; *Sukenik, Segal & Graff, P. C.,* attorneys), for Sylvia Riese.

*Theodore S. Steingut, Scott E. Mollen, Franklin R. Kaiman* and *Warren A. Estis* of counsel *(John Sheridan* and *Gary M.*

*Rosenberg, Michael E. Feinstein* and *William J. Robbins* on the brief; *Dornbush Mensch Mandelstam & Schaeffer, L. L. P., Graubard Mollen & Miller,* and *Rosenberg & Estis, P. C.,* attorneys), for Anita Riese and others.

*Robert M. Abrahams* of counsel *(Arnold Spellun* and *Andrew Berdon* on the brief; *Schulte Roth & Zabel,* attorneys), for Fritz W. Alexander, II.

### OPINION OF THE COURT

SULLIVAN, J. P.

These four appeals arise out of an action to foreclose, *inter alia,* various mortgages and leasehold interests in 14 parcels of realty, pledged and collaterally assigned to plaintiff, The Bank of Tokyo Trust Company, a New York banking corporation, as security for loans advanced by it to The Urban Food Malls Ltd. (UFM), a defendant herein. Although the facts underlying the loan advances and subsequent default are complex, the legal issue at the heart of these appeals—whether a pledgee of a mortgage may institute an action to foreclose on the real property under the Real Property Actions and Proceedings Law (RPAPL) without first proceeding to foreclose its security interests under the Uniform Commercial Code (UCC)—is relatively straightforward. Complicating this issue and the others posed, however, is the injection of extraneous matter involving spurious and totally meritless claims of ethical violations against the court-appointed receiver of the subject properties as well as the appointing Judge. These claims are nonetheless argued and permeate the proceedings.

Sylvia Riese, as executrix of the estate of Irving Riese, Anita Riese as temporary administratrix of the estate of Murray Riese, I.C. Terminal Inc., 160 W. Inc. and I & M 162 Associates, each a defendant herein, are the fee owners of one or more of the subject parcels of real property. The Riese family controls the corporate fee owners, and Irving and Murray Riese owned 11 of the properties directly. Their estates now own the properties as tenants in common. The net lessees of the subject properties, 14 in all, owned and controlled by the Riese family, are also defendants herein. The subtenants, some of which are affiliates of the Riese family, are currently paying rents to the net lessees.

On December 9, 1987, UFM, which is also owned and controlled by the Riese family, issued short-term commercial paper notes (debt securities) to the investing public in the face amount of $75,000,000. The proceeds of these notes were used

by UFM to purchase or extend the underlying mortgages encumbering each of the 14 properties. These debt securities had maturity dates ranging from approximately 30 to 90 days. UFM's obligation to repay the notes upon maturity was secured by an irrevocable letter of credit issued by The Bank of Tokyo, Ltd. (the bank), acting through its New York agent, plaintiff. In the event UFM failed to honor the notes, the trustee for the benefit of the holders of the notes was entitled, in payment thereof, to draw down on the bank's letter of credit. As part of the original transaction, UFM, plaintiff and the bank entered into a reimbursement agreement, which provided that in the event of a draw down on the letter of credit UFM would reimburse the bank. In order to enable UFM to do so, plaintiff agreed, under the reimbursement agreement, to make available to UFM a credit facility up to $75,000,000. Simultaneously with a draw down on the letter of credit, plaintiff would advance funds to the bank under the credit facility to effect an immediate repayment of the amount drawn down. These loans were to be charged to UFM either as short-term loans or term loans, depending on the length of time they were outstanding. A short-term loan was the amount advanced to reimburse the bank for any draw under the letter of credit. The outstanding balance of such a loan became a term loan on the 181st day after the loan had been advanced.

As evidence of its obligation to plaintiff for any such advances under the credit facility, UFM executed and delivered to plaintiff a promissory note in the amount of $75,000,000, subsequently reduced to $62,321,000, which, after an extension, matured on March 9, 1995. As security for its obligations to plaintiff under the reimbursement agreement and promissory note, UFM collaterally assigned to plaintiff, *inter alia,* all of its right, title and interest in and to the underlying mortgages and notes, including the right to collect rent. After using the proceeds of the commercial paper transaction to extend or purchase the underlying mortgages encumbering the 14 parcels, UFM then consolidated and modified the mortgages and spread them into three separate mortgages, which it held. These are the collaterally assigned mortgages.

As the debt securities matured, they would be repaid either out of the sale of new paper, the sale of which would coincide with the maturity date of the old paper, or through a draw down on the letter of credit. Between December 1987 and March 9, 1995, the selling of new commercial paper to repay holders of maturing paper occurred every 30 to 90 days. Dur-

ing this period, there were at least 73 short-term loans to UFM by plaintiff. Each of the short-term loans was then repaid by UFM within approximately five days of the sale of further debt securities. No short-term loan was ever converted to a term loan.

By its express terms, the credit facility came to an end on March 9, 1995. Accordingly, on that date, all the outstanding debt securities, totalling $62,321,000, matured. The trustee for the holders of the debt securities, in order to repay them, drew down $62,321,000 on the letter of credit. Pursuant to the terms of the reimbursement agreement, plaintiff, that same day, made a final short-term loan to UFM of $62,321,000, which was used to repay the bank for the draw down. Thus, on March 9, 1995, when the UFM promissory note matured, UFM became obligated to repay plaintiff the sum of $62,321,000, the principal amount of the credit facility due under the promissory note and the amount then "outstanding as a Short Term Loan or Term Loan".

UFM's failure to pay the $62,321,000 due to plaintiff under the promissory note within five business days of March 9, 1995 constituted an event of default, which, under section 8.1 (A) (b) of the reimbursement agreement, is defined as occurring "if [UFM] shall fail to pay when due any installment of interest or principal or any other sums payable, or if [UFM] shall fail to reimburse [the bank] or [plaintiff] when required, under this Agreement, the [UFM promissory] Note, the Assignments of Mortgages, or any other Security Document or if [UFM] shall fail to comply with any monetary covenant made by it in any Security Document".*

Other events of default occurred as a result of the nonperformance of certain obligations required by the underlying mortgages. Section 8.1 (A) (b) of the reimbursement agreement provides that an event of default occurs "if any default shall occur and continue beyond any notice or cure period under any [underlying] Mortgage". By their terms, the underlying notes for each of the mortgaged properties also matured on March 9, 1995 in the total amount of $62,321,000, which the mortgagors failed to pay. They also failed to cure the defaults within five business days as required by the mortgage spreader, consolidation and modification agreement.

---

* A security document, as defined in the reimbursement agreement, includes, *inter alia*, the reimbursement agreement, the UFM promissory note, the mortgage assignment and the underlying mortgages.

As a result of these defaults, plaintiff, on June 14, 1995, commenced this foreclosure proceeding. In that regard, section 8.1 (C) of the reimbursement agreement provides that "[plaintiff] may proceed to exercise, independently, any rights and remedies available hereunder, including without limitation * * * [those] under any of the Security Documents, or under any applicable law." Section 5 of each mortgage assignment provides that plaintiff, upon an event of default, "may avail itself of all rights and remedies provided under this Assignment, the Reimbursement Agreement and/or any other Security Documents, at law, in equity, or otherwise". Section 2.01 (III) (2) of each of the underlying mortgages contains one of the "rights and remedies provided under" the Security Documents referred to in the reimbursement agreement and mortgage assignments. That section expressly provides, *inter alia*, that plaintiff, as UFM's assignee, may "[s]ell the [property and assets encumbered by the (underlying) Mortgage] or any part thereof"; "[i]nstitute an action of judicial foreclosure on th[e underlying] Mortgage or institute other proceedings according to law for the foreclosure hereof, and may prosecute the same to judgment, execution and sale of the collection of the Liabilities" and "[t]ake such steps to protect and enforce its rights whether by action, suit or proceeding in equity or at law for the specific performance of any covenant, condition or agreement in the Loan Documents * * * or for any foreclosure hereunder".

The owners and net lessees moved pursuant to CPLR 3211 (a) (1), (5) and (7) to dismiss the complaint on the grounds that plaintiff lacks standing to maintain this foreclosure proceeding and that the action is premature. Specifically, the owners and net lessees argued that plaintiff has a security interest in the mortgage documents only and, thus, it is not the assignee of UFM's rights under the mortgages. They view plaintiff's security interest as personalty and, thus, urge that this transaction is controlled by the Uniform Commercial Code, which does not permit a pledgee to foreclose under the mortgages, but requires that a pledgee, such as plaintiff, first conduct a sale of its security interest in the mortgage. The IAS Court rejected both arguments and denied dismissal of the complaint. This determination is before us on appeal.

The mortgages covering each of the 14 properties also provided, in the event of default, for the appointment of a receiver. On June 16, 1995, the IAS Court appointed Fritz W. Alexander, II, Esq., a retired Judge of the Court of Appeals, as receiver of the subject properties and subsequently, after an ex

parte application, authorized him to retain, as counsel, the law firm of Epstein Becker & Green, P. C., as to which he acts as "Special Counsel." Since the time of his appointment, the receiver has endeavored to fulfill the duties of his charge, including the collection of rents, so as to preserve the mortgaged properties. He has, however, been frustrated by the actions of the net lessees. For instance, in violation of the receiver's notice to attorn, the net lessees, for over one year now, have avoided paying rent to the receiver, now in excess of $7 million, which has also been collaterally assigned to plaintiff. During the same period, the net lessees have collected rent in excess of $6 million from their subtenants. The receiver has obtained a judgment against the net lessees covering rent arrears through January 31, 1996 in the amount of $4.99 million, no part of which has been paid.

Before the entry of judgment, the receiver, faced with the net lessees' intransigence, moved to compel them to attorn and pay him the rent arrears as well as rent that was to become due. The motion was granted and an order entered requiring each of the 14 net lessees to pay the receiver its pro rata share of the arrears and the rent which is to become due each month. The net lessees appeal from this order, arguing that the receiver, as a nonparty, could not bring a motion to compel attornment in the context of this foreclosure proceeding but, rather, was required to commence a nonpayment proceeding in the Civil Court. The net lessees also contend that the receiver failed to submit sufficient proof of a short-term loan to UFM, the borrower on the underlying credit facility, the nonpayment of which triggered their rental obligation to the receiver.

Plaintiff and the receiver cross-appeal from two portions of the same order, namely, a provision that no rent was due from the net lessees for the month of March 1995 and a provision that the net lessees are entitled to an offset against current rents due the receiver based upon alleged overpayments of rent made prior to the receiver's appointment.

On July 21, 1995, counsel for the net lessees submitted, by letter, an application to the IAS Court for disqualification of Epstein Becker & Green as counsel to the receiver; disqualification of Mr. Alexander as receiver; and disqualification of the law firm of Orrick, Herrington & Sutcliffe, plaintiff's attorneys. The letter, unsworn and based on an "investigation" by counsel, provided the sole factual support for the relief sought, i.e., that Raymond Goldfaden, Esq., an associate at the Epstein Becker & Green firm, had, while employed at a different law

firm, formerly represented the Riese family and some of the defendants herein on various transactional matters from 1966 to 1986. Counsel alleged that Mr. Goldfaden "worked on various 'Riese-related' matters" and that "the Riese Organization would look to [Goldfaden] for advice, consultation, and the preparation of necessary documents to operate their businesses". The letter further alleged that "Mr. Goldfaden also negotiated and drafted at least two of the Master Leases for the properties at issue (which leases were thereafter amended and restated in the transaction at issue)." Significantly, there is no allegation that Mr. Goldfaden, who ceased working in any capacity for the Rieses prior to the underlying December 1987 transaction, ever worked on any Riese matter while at the Epstein Becker & Green firm. Thus, nearly a decade passed between the time Mr. Goldfaden last worked on a Riese matter and the commencement of this action. Nor was there any suggestion that Mr. Goldfaden is a potential fact witness in this lawsuit.

The IAS Court disqualified Epstein Becker & Green "because of the spectre of a possible conflict." Finding that the receiver "had no discussions with Mr. Goldfaden in which he heard anything of substance about any defendant herein or other person or entity affiliated with the 'Riese Organization'," the court denied the application to disqualify both Mr. Alexander, as receiver, and plaintiff's counsel. That part of the order denying disqualification of Mr. Alexander is challenged on appeal, the net lessees arguing that since the Epstein Becker & Green firm was disqualified and Mr. Alexander is affiliated with that firm he could not represent the receiver as an attorney and it therefore necessarily follows that he cannot act as receiver.

Finally, plaintiff and the receiver appeal from an order which modified the receiver's order of appointment to remove his power to collect rents directly from the subtenants. The IAS Court granted plaintiff's and the receiver's application for reargument but, on reargument, adhered to its determination that the receiver could not collect subrents.

■ Turning first to the appeal from the denial of the dismissal motion, the owners and net lessees argue that plaintiff cannot foreclose directly against the subject properties because the mortgages were collaterally, not unconditionally, assigned and that therefore plaintiff, as the pledgee of a security interest in personalty, must first avail itself of the remedies provided by article 9 of the Uniform Commercial Code. This argument, based on section 9-102 (1) thereof, which provides:

"Except as otherwise provided * * * this Article applies (a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts," lacks merit.

New York law, both before and after the enactment of the Uniform Commercial Code, permits a pledgee, in the case of a mortgage pledged as collateral to secure a debt, to institute an action to foreclose on the mortgaged property provided that the pledgor is joined as a party, either as a plaintiff or defendant. (*In re Renaissance Residential Dev. Assocs.*, 146 Bankr 68, 71 [ED NY]; *see, Federal Deposit Ins. Corp. v Forte*, 94 AD2d 59; *see also, Matter of Gilbert*, 104 NY 200, 209, 212; *Title Guar. & Trust Co. v Leopoldt*, 248 App Div 919, 919-920.) Such a pledge constitutes a complete assignment of the mortgage in which the pledgee has a superior interest. (*In re Renaissance Residential Dev. Assocs.*, *supra*, 146 Bankr, at 71; 78 NY Jur 2d, § 548.) "The pledgee may bring [a foreclosure] action and will be deemed a trustee of the pledgor for any of the mortgage debt remaining after satisfying the pledgee's claim. [Citation omitted.] * * * [I]n cases where the mortgage has been pledged as collateral security for a debt which is less than the amount of the mortgage, the pledgee has a defeasible title in the property, which is extinguished upon payment of the debt. [Citation omitted.] * * * The pledgee is still entitled to foreclose on the pledged mortgage, but the pledgor must be joined as a necessary party to the pledgee's bill of foreclosure". (146 Bankr, *supra*, at 71.) In a case where "both the pledgee and pledgor bring a joint foreclosure action, the rights of both parties are foreclosed by the judgment of foreclosure, but the rights as between the pledgee and pledgor are not affected." (146 Bankr, *supra*, at 71.) Thus, where, as here, the pledgor, UFM, is joined in the foreclosure action, the pledgee of the collateral assignment of a mortgage is entitled to foreclose on the pledged mortgage.

*Federal Deposit Ins. Corp. v Forte* (94 AD2d 59, *supra*) is to the same effect. There, Federal Deposit, as the holder of a collateral assignment of a mortgage, without first commencing a Uniform Commercial Code foreclosure, brought a foreclosure action on the underlying mortgage, joining the pledgor as a party. Noting the issue as to whether the Uniform Commercial Code applied to a pledge of a mortgage as collateral, the Court held: "We are of the opinion that, according to the plain meaning of subdivision (3) of section 9-102 and Comment 4 to section

9-102 of the Uniform Commercial Code, the proper view is that article 9 of the code should apply 'to all facets of transactions using mortgages and notes as collateral except those issues that arise when the mortgagee's creditor is attempting to enforce the mortgagee's rights under the mortgage'." (*Supra,* at 65, quoting Comment, *Security Interests in Notes and Mortgages: Determining the Applicable Law,* 79 Colum L Rev 1414, 1427 [1979], and citing *Landmark Land Co. v Sprague,* 529 F Supp 971, 976-977, and cases cited therein.) As the note commentator (Comment, *Security Interests in Notes and Mortgages: Determining the Applicable Law,* 79 Colum L Rev, *op. cit.,* at 1432) succinctly stated: "Article 9 should be applied to determine which party has a prior claim to the note; the right to the mortgage should always vest in the same party. Article 9 would be applied, under this approach, to all aspects of the security interest in the note and mortgage, except for attempts by the mortgagee's creditor to assert rights under the mortgage, which would continue, as contemplated by article 9, to be governed by real property law."

In the instant matter, it is unquestioned that plaintiff, in possession of UFM's promissory note and the collateral assignments of mortgages from UFM, has a superior security interest pursuant to article 9 of the Uniform Commercial Code. As is eminently clear from the relevant mortgage documents, plaintiff, as the creditor, has the right under real property law to foreclose against the real property. The commercial reasonableness of the disposition of the collateral after a judgment of foreclosure under Uniform Commercial Code § 9-504 and the disposition of the proceeds therefrom to the pledgee and pledgor in accordance with their respective rights is determined by recourse to the Uniform Commercial Code.

In arguing that plaintiff may not resort to the remedy of judicial foreclosure with respect to the 14 parcels, the owners and lessees rely on Uniform Commercial Code § 9-501 (1) and § 9-504. Rather than acting as a bar, however, section 9-501 (1) expressly grants a secured party the right, after a debtor's default, to "foreclose or otherwise enforce the security interest by any available judicial procedure." Moreover, the section also provides that "[w]hen a debtor is in default under a security agreement, a secured party has the rights and remedies provided in this Part and except as limited by subsection (3) those provided in the security agreement." The security agreements—the mortgage assignments and underlying mortgages—expressly accord plaintiff the right to commence a judicial foreclosure under the RPAPL.

As noted, section 5 of each assignment entitles plaintiff, upon an event of default, to "avail itself of all rights and remedies provided under this Assignment * * * and/or any other Security Documents, at law, in equity, or otherwise." One of the "rights and remedies" found in the Security Documents, which, as that phrase appears in the mortgage assignments, has the same meaning as in the reimbursement agreement and is defined in the latter to include the underlying mortgages, appears in section 2.01 (III) (2) of the underlying mortgages. That section provides, *inter alia*, that UFM, the mortgagee and, in turn, plaintiff, its assignee, may "[i]nstitute an action of judicial foreclosure on this Mortgage * * * and may prosecute the same to judgment, execution and sale." Furthermore, section 6 of each of the mortgage assignments expressly appointed plaintiff as "the attorney-in-fact, with full power of substitution, of [UFM], during the continuance of any Event of Default, for the purpose of * * * enforcing all performances under the Mortgage Documents". Thus, the mortgage assignments, in plain language, gave plaintiff the right to commence this foreclosure action.

The owners and lessees nonetheless contend that plaintiff's right under the security agreements to commence a judicial foreclosure is unenforceable under Uniform Commercial Code § 9-501 (3) (b), which prohibits predefault waivers of the protections accorded to debtors under section 9-504 with respect to the disposition of collateral. Section 9-504, however, by its express terms, applies to the disposition of collateral and the commercial reasonableness of that disposition and not to the means by which a creditor, prior to its disposition, forecloses on the collateral. There has been no predefault waiver of debtor rights as to the disposition of collateral, which will be determined in accordance with the Uniform Commercial Code's provisions. Until there has been a judicial foreclosure, section 9-504 has no application.

Notwithstanding UFM's failure to pay plaintiff $62,321,000 on the March 9, 1995 maturity date of the UFM promissory note and the fact that under the express language of the reimbursement agreement, the UFM promissory note, the mortgage assignment and the underlying mortgages said failure constitutes an event of default, and notwithstanding that due demand for payment has been made and that the default has not been cured, the owners and lessees contend that the action is premature. They argue that because of the March 9, 1995 draw down on the bank's letter of credit to pay the hold-

ers of UFM's debt securities, which, in turn, triggered a short-term loan from plaintiff to UFM to repay the bank, this foreclosure action could not have been commenced until September 6, 1995, when the short-term loan would convert to a term loan. The IAS Court properly rejected this argument.

The maturity date of the short-term loan is not separate from the maturity date of the UFM promissory note. "The note * * * is the legal evidence of indebtedness." (Madison & Dwyer, Law of Real Estate Financing § 5.09 [3] [1994]; *see, Smith v Treuthart*, 130 Misc 394, 395.) When the note matures, the loan necessarily matures and payment is due (*see, supra,* at 395-396), precisely as the reimbursement agreement and the UFM promissory note provide with respect to UFM's obligation to repay any short-term loan that is outstanding on the date of maturity of the UFM promissory note. Section 2.3 (b) of the reimbursement agreement provides: "[UFM] hereby agrees to repay to [plaintiff] each Short Term Loan or Term Loan, as the case may be, with interest, as set forth in and in accordance with the [UFM promissory n]ote." The UFM promissory note similarly provides that UFM "promises to pay * * * [plaintiff] on [March 9, 1995] (the 'Maturity Date'), Seventy-Five Million and No/100 dollars ($75,000,000) or so much thereof as may be outstanding as a Short Term Loan or a Term Loan under the Reimbursement Agreement (the 'Principal Amount'), together with interest thereon as provided herein." Thus, on March 9, 1995, the maturity date under the UFM promissory note, there existed an outstanding "short term loan" of $62,321,000, which, as of that date, matured and was payable.

Even if we were to accept the argument that the maturity date of the short-term loan is separable from the maturity date of the UFM promissory note, so that the short-term loan's maturity date would be 181 days after March 9, 1995, UFM, pursuant to the terms of the UFM promissory note, was required, on March 9, 1995, to pay plaintiff the principal amount of $62,321,000 or the "amount outstanding as a Short Term Loan." Irrespective of whether the short-term loan had matured, it was undisputably outstanding in the amount of $62,321,000 and UFM's failure to pay the amount "outstanding" as a short-term loan on March 9, 1995 constituted an event of default under the express terms of the UFM promissory note and section 8.1 (A) of the reimbursement agreement, and triggered plaintiff's right to commence a foreclosure proceeding.

■ With respect to the order compelling the net lessees to pay rent to the receiver, the right of a receiver to compel attornment and collect rent in the context of a foreclosure proceeding is well established. (*See, e.g., Banque Nationale de Paris v 1567 Broadway Ownership Assocs.*, 202 AD2d 251, 251-252, *lv dismissed* 83 NY2d 1000; *Home Sav. Bank v 137 Duane St. Assocs.*, 197 AD2d 368, *appeal dismissed* 82 NY2d 888; *Aetna Life Ins. Co. v ABS Props.*, 186 AD2d 448.) Moreover, in granting the receiver's motion, the IAS Court was merely enforcing the terms of its prior amended receiver order which authorized the receiver to move to compel attornment and which the net lessees had disregarded. No separate proceeding was required by the amended receiver order and no reason is shown why a receiver must, as argued, commence a separate proceeding to enforce an order in a foreclosure proceeding authorizing the receiver to collect rents. The Supreme Court "has 'broad power' to prevent frustration of an order appointing a receiver of rents." (*New York City Community Preservation Corp. v Michelin Assocs.*, 115 AD2d 715, 717, *lv denied* 68 NY2d 604.) Needless to say, no precedent is cited to suggest, even remotely, that a receiver may not, in a pending foreclosure action, move to compel attornment.

The net lessees, citing *City Bank Farmers Trust Co. v Dayfield Realty Corp.* (269 App Div 426), argue that a summary direction for the payment of rent should be limited to instances where nonpayment would frustrate the receiver's possession of the mortgaged property. At issue in *City Bank* was a dispute over rents which, pursuant to agreements between the mortgagee and mortgagor, had accrued and been paid into escrow accounts prior to the receiver's appointment. No dispute existed as to the receiver's entitlement to rent that was unpaid or accrued after the receiver's appointment. The court held that "the rights of the parties under the agreements made before the commencement of the receivership insofar as they accrued before such appointment involve issues of title to property which must be decided in a plenary action." (*Supra,* at 429.) The holding of *City Bank* has no application here, where the receiver is not claiming a right to rents paid before his appointment.

Furthermore, the net lessees' refusal to pay rent to the receiver would frustrate the order appointing him, as well as the amended receiver order, expressly requiring the receiver to collect and retain all rents. The receiver's ability to comply with his responsibilities thereunder and his ability to preserve

the collateral secured by the mortgage would also be frustrated if the net lessees were not required to pay rent to the receiver.

The net lessees also argue that the receiver should not be permitted to enter as a judgment, pursuant to CPLR 2222, the attornment order directing the net lessees to pay him rent and covering certain rent arrears because, they argue, the receiver is not a party to the proceeding and CPLR 2222 relief is limited to parties. Since a receiver may, in a foreclosure proceeding, compel a tenant to attorn, that is, to recognize and pay rent to him, and, in the instant matter, the receiver has obtained an order directing the payment of rent to him, he may, under CPLR 2222, enter that order as a judgment.

Plaintiff and the receiver cross-appeal from that portion of the attornment order excluding the March 1995 rent from the rent arrears due on the ground that in order to be included there had to be a loan outstanding on February 25, 1995. Here, the loan was concededly not due until March 9, 1995. In this regard, the IAS Court misconstrued the reimbursement agreement, which requires that rent for any given month be computed on the 25th day of the prior month based on the interest plaintiff expects "will accrue" on any short-term loan. The reimbursement agreement provides that rents are to be computed on anticipated, not current, debt service. By making such computation on the 25th day of the preceding month, plaintiff could establish and UFM could bill the exact amount of rent due on the first day of the following month.

In calculating the March 1995 rent on February 25, 1995, plaintiff knew that a $62,321,000 obligation under UFM's debt securities would mature on March 9, 1995 and that, under the reimbursement agreement's terms, the trustee for the holders of these securities, in order to pay the holders, would therefore be required to draw down that amount under the letter of credit. This, in turn, would, pursuant to the terms of the reimbursement agreement, trigger a short-term loan from plaintiff to UFM in the sum of $62,321,000. Thus, as of February 25, 1995, plaintiff could calculate the amount of the short-term loan that would be due on March 9, 1995, as well as the interest that would accrue on such loan through March 31, 1995. Thus, the receiver was entitled to an award for the March 1995 rent arrears.

Plaintiff and the receiver also cross-appeal from that portion of the attornment order which allowed the net lessees to withhold the payment of $775,900.24 against the rent due the receiver for alleged overpayments of rent from November 1992

through February 1995. The IAS Court, without deciding the merits of the alleged right to an offset, found that this amount represented an extra 20% paid to plaintiff as a result of the alleged 1992 default under the reimbursement agreement, which was not an event of default under the master leases. Putting aside the fact that the right to an offset is a claim that should be asserted, not against plaintiff, but, rather, the owners and UFM, which directed the net lessees to pay the default rate, it is not at all clear that the net lessees, in fact, overpaid. The net lessees ignore section 5.2 of the reimbursement agreement, which provides that the master leases are "net" leases with respect to the owners and that an event of default as defined in the reimbursement agreement fixes the rent obligation under the master lease at the default rate of 120% of the anticipated debt service. Thus, irrespective of whether there was an event of default under the master leases, an event of default under the terms of the reimbursement agreement would fix the rent under the master lease at the default rate. It is not disputed that an event of default under section 8.1 (A) (e) of the reimbursement agreement occurred in November 1992, thus fixing rent under the master lease at 1.2 times the anticipated debt service.

On this record, it cannot be determined whether the net lessees' claim of overpayment, even if it has merit, is properly asserted against plaintiff. The IAS Court made no finding in this regard. In any event, the net lessees should not have been allowed to withhold the payment of $775,900.24 in rent. This sum should be paid to the receiver, who shall hold it in a separate account pending the IAS Court's determination of the overpayment issue.

On the issue of disqualification, there is no basis, legal or factual, to remove Mr. Alexander as receiver. The claims of impropriety and appearance of impropriety are completely unsupported. The only factual basis in support of the application is the July 21, 1995 letter from counsel for the net lessees, a document replete with unsupported and conclusory beliefs and without any evidentiary value. Aside from the conclusory allegation that Mr. Goldfaden "regularly spoke to, consulted and advised the officers of the various companies affiliated with the Riese Organization", the only specific matter that Mr. Goldfaden is claimed to have worked on with a nexus to this litigation is the negotiation of two of the master leases, which were pledged, in December 1987, at least one year after Mr. Goldfaden ceased working on Riese matters, as additional collateral

to induce plaintiff to extend loans to UFM under a $75,000,000 credit facility. These leases are, of course, neither confidential nor unique in nature and their content was obviously revealed to plaintiff when the credit facility was negotiated and the mortgages collaterally assigned. In any event, the master leases were thereafter "amended and restated" by an attorney other than Mr. Goldfaden in connection with the underlying transaction. There is no showing of any confidence that was betrayed by Mr. Goldfaden, much less one that was conveyed to Mr. Alexander. We are not unmindful of the Court of Appeals concern that "disqualification motions may be used frivolously as a litigation tactic when there is no real concern that a confidence has been abused." (*Solow v W. R. Grace & Co.*, 83 NY2d 303, 310.)

The application to remove Mr. Alexander rests on the mistaken premise that a receiver should be viewed as a party adverse to the net lessees and owners. A receiver "is an officer * * * of the court, subject, at all times, only to its direction and control" (*Jamaica Sav. Bank v Florizal Realty Corp.*, 95 Misc 2d 654, 656); a receiver is charged with the responsibility to "preserve and protect the property for the benefit of *all persons interested in the estate*" (*supra*, at 656). His allegiance is only to the court. (*Supra.*) Even assuming, however, that the rules of disqualification with respect to adverse attorneys applied to a receiver, no basis for Mr. Alexander's disqualification has been shown.

A party seeking to disqualify an attorney representing an adverse interest because of the attorney's prior representation of the party must show that the matter on which the attorney previously worked was "substantially related" to the current litigation. (*Solow v W. R. Grace & Co.*, 83 NY2d, *supra*, at 313.) Absent a substantial relationship between the two matters, the party seeking disqualification must demonstrate that the attorney received confidential information about the party that is "substantially related" to the current litigation. (*Lightning Park v Wise Lerman & Katz*, 197 AD2d 52, 55.)

The owners and net lessees have not shown that the underlying foreclosure action is substantially related to any of the matters on which Mr. Goldfaden worked for the Rieses. They allege on appeal that Mr. Goldfaden's former firm "developed the structure of the Riese Organization, including incorporating at least two of the corporate defendants named in this lawsuit", that it "represented the Riese interests in the purchase and sale of real estate, the leasing of property and

the creation and proper updating of corporate records". Mr. Goldfaden is alleged to have worked on these matters, first as an associate and, then, from the early 1980's through his departure in 1986, as the partner having primary responsibility. The owners and net lessees have failed to show that this general corporate work on behalf of the Rieses is substantially related to this action, which involves the foreclosure of 14 mortgages and leasehold interests pledged as security for loans under a credit facility. Knowledge of a former client's financial and business background is not a basis for disqualification if that background is not an issue in the subsequent litigation. (*United States Football League v National Football League*, 605 F Supp 1448, 1460.) If the arguments of the owners and net lessees were to prevail, an attorney who performed a function so general as incorporating a client could never oppose that client in any subsequent commercial litigation.

While the two master leases drafted by Mr. Goldfaden, which were thereafter amended and restated by another attorney, have a place in this proceeding to the extent they form part of the collateral for the loans under the credit facility, they are not related—much less substantially related—to UFM's default under the loan and the other matters at issue in this proceeding, including the right of a mortgage pledgee to foreclose on the mortgaged property. (*See, e.g., Matter of Prudential Sec. v Wyser-Pratte*, 187 AD2d 306; *Ashbaugh v West 13th St. Owners*, 77 AD2d 842.)

Nor have the owners and net lessees made a showing of any specific confidential information held by Mr. Goldfaden or how any confidential information is substantially related to the instant action. A party seeking disqualification must identify the "specific confidential information imparted to the attorney". (*Saftler v Government Empls. Ins. Co.*, 95 AD2d 54, 57.) General allegations of confidential information receiving, such as, that "Mr. Goldfaden had unrestricted access to the Riese Organization personnel and documents", will not do. (*See, e.g., Nowak v Pillich*, 186 AD2d 1018.) Furthermore, the owners and net lessees have not shown that the confidential information obtained by Mr. Goldfaden, unspecified as it is, is substantially related to this action.

The owners and net lessees also argue that Mr. Alexander should be disqualified as receiver because of his affiliation with the Epstein Becker & Green firm, previously disqualified as counsel to the receiver. Assuming, arguendo, that Epstein Becker & Green was properly disqualified, an issue not before

us, that disqualification does not provide a rationale for Mr. Alexander's disqualification. The owners and net lessees, relying on the principle of attribution, assert that since one attorney at Epstein Becker & Green holds confidential information, the entire firm, including Mr. Alexander, must be disqualified. The short answer, of course, is that Mr. Alexander is not acting as an attorney representing a party in this action. He is a receiver, acting as an officer of the court. In any event, as noted and as the IAS Court found, there is no evidence of any confidential information being passed to Mr. Alexander. In that regard, we note that Epstein Becker & Green is a large, departmentalized firm with over 140 lawyers in its New York City office. In such circumstances, given Mr. Alexander's short tenure with the firm—he joined in 1994, eight years after Mr. Goldfaden last performed legal work of a general corporate nature for the Rieses and seven years after the underlying transaction took place—there is no factual basis from which to infer that Mr. Alexander learned of any alleged Riese confidences.

▌ Finally, it was error to deny the receiver the right to collect rents directly from the subtenants. Section 4.02 of the underlying mortgages specifically provides that each mortgagor "assigns to [plaintiff] all Leases and all Rent payable under each Lease now or at any time hereafter existing". In section 4.01, the term lessee is defined as "the lessee, sublessee, tenant or other person having the right to occupy or use a part of the Mortgaged Property under a Lease." Moreover, section 15.01 of the master leases, which were also assigned to plaintiff, expressly provides that the master leases and the master lessee's rights thereunder are "subject and subordinate to" the mortgages. Under section 2.03 of the mortgages, each mortgagor consented to the appointment of a receiver of the mortgaged property and of the rents and income thereof.

As noted, it is well settled that a receiver in a foreclosure proceeding may collect the rent generated by the mortgaged property. (*Dollar Sav. Bank v Sunnybrook Assocs.*, 272 App Div 734, 737, *lv denied* 273 App Div 808.) It is equally well settled that, where, as here, the mortgages expressly provide that all rents and subrents are assigned as collateral and the master leases are made "subject and subordinate to" that assignment, a receiver may collect rent directly from the subtenants in a foreclosure action. (*Bank of Manhattan Trust Co. v 571 Park Ave. Corp.*, 263 NY 57; *Schwarz v Alexander*, 178 App Div 641.)

Indeed, those courts that have considered a "subject and subordinate to" clause similar to the one herein, have construed it

to mean that the master tenant agrees to be and is bound by the terms of the mortgage, including the assignment of subrents thereunder, and cannot defeat its pledge of rents to the mortgagee. (*See, e.g., Empire State Collateral Co. v Bay Realty Corp.*, 232 F Supp 330 [ED NY]; *see also, New York City Community Preservation Corp. v Michelin Assocs.*, 115 AD2d 715, *supra*; *Colter Realty v Primer Realty Corp.*, 262 App Div 77, 79.) Thus, the IAS Court erred when it concluded that the "subject and subordinate to" clause in the master lease does not constitute a consent by the master tenant to allow the receiver to bypass him and look directly to the subtenants for the rent.

The net lessees cite *Prudence Co. v 160 W. Seventy-third St. Corp.* (260 NY 205) and *Central Sav. Bank v Chatham Assocs.* (54 AD2d 873) in support of their argument that the receiver is prohibited from collecting subrents. The net lessees' reliance is misplaced. *Prudence* stands for the unremarkable proposition that a receiver may not require the subtenant to pay more in rent to the receiver than the rent required of the subtenant under the sublease or the rent the master tenant is required to pay to the owner. In *Central Sav.*, this Court, following *Prudence's* prohibition against the collection of subrent greater than that due under the sublease, reversed an order directing the receiver to collect from the subtenants rent greater than the rent due the owner from the master tenant (54 AD2d, *supra*, at 874; *see also, Markantonis v Madlan Realty Corp.*, 262 NY 354, 360). Here, it is undisputed that, in accordance with *Prudence*, the receiver seeks only the agreed-to subrents and no more. And, unlike *Central Sav.*, the subrents being sought from the subtenants are less than the rents due from the net lessees.

■ One other point needs to be addressed. The owners and net lessees argue that all the orders on appeal should be vacated and declared null and void since they were rendered by a Judge who subsequently recused herself. During the pendency of this appeal and before final submission, the Justice who determined each of the orders on appeal, *sua sponte*, recused herself from further proceedings in this matter. This was subsequent to her denial of a motion to renew the denial of prior recusal motions. These motions had been premised on the Justice's past relationship with Mr. Alexander, the receiver she appointed, and her failure to disclose that relationship. The IAS Court Justice also subsequently, *sua sponte*, recused herself in an unrelated case in which the net lessees' counsel represents one of the parties.

Although the orders denying the recusal motions are not directly before us on appeal, having been rendered academic, there clearly was no legal basis for recusal. The owners and net lessees allude to a long-past "romantic relationship" between the Justice and Mr. Alexander (neither of whom, incidentally, was married at the time). This, of course, does not constitute a ground for disqualification or trigger any disclosure requirements. The Justice's subsequent decision to withdraw from the case, no doubt out of recognition of the fact that her prior relationship with the receiver, rather than the legal issues posed, was becoming the focal point of the case, cannot transform a worthless recusal claim into one with merit. Nor has any actual bias, as alleged, been shown.

We have examined the other arguments advanced by the owners and net lessees and find that they are without merit.

Accordingly, the order of the Supreme Court, New York County (Jane S. Solomon, J.), entered July 29, 1995, to the extent that it denied the net lessees' motion to disqualify Mr. Alexander as receiver, should be affirmed, without costs and disbursements; the order of the same court and Justice, entered September 20, 1995, which, *inter alia*, granted the net lessees' motion to modify the order appointing the receiver, should be reversed to the extent appealed from, on the law, with costs and disbursements, to allow the receiver to collect subrents from the subtenants of the mortgaged properties; the order of the same court and Justice, entered December 19, 1995, denying the owners' and net lessees' motions to dismiss the complaint, should be affirmed, with costs and disbursements; the order of the same court and Justice, entered January 9, 1996, which, *inter alia*, granted the receiver's motion to compel attornment, should be modified, on the law and the facts, to include the March 1995 rent in the judgment for rent arrears due the receiver and to vacate that provision thereof which allowed the net lessees to withhold the payment of $775,900.24 and instead direct the net lessees to pay said sum to the receiver to hold separately pending the IAS Court's resolution of the overpayment issue, and, except as thus modified, affirmed, with costs and disbursements to plaintiff.

Motion to strike with respect to all matters dehors the record granted and cross motion to enlarge denied.

WALLACH, KUPFERMAN and NARDELLI, JJ., concur.

Order, Supreme Court, New York County, entered July 29, 1995, affirmed, without costs and disbursements; order, same court and Justice, entered September 20, 1995, reversed to the

extent appealed from, on the law, with costs and disbursements, to allow the receiver to collect subrents from the subtenants of the mortgaged properties; order, same court and Justice, entered December 19, 1995, affirmed, with costs and disbursements; order, same court and Justice, entered January 9, 1996, modified, on the law and the facts, to include the March 1995 rent in the judgment for rent arrears due the receiver and to vacate that provision thereof which allowed the net lessees to withhold payment of $775,900.24 and instead direct the net lessees to pay said sum to the receiver to hold separately pending the IAS Court's resolution of the overpayment issue, and, except as thus modified, affirmed, with costs and disbursements to plaintiff. Motion to strike with respect to all matters dehors the record granted and cross motion to enlarge denied.